UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-81091-CIV-RYSKAMP/VITUNAC

ARMOR SCREEN CORPORATION,
a Florida corporation,

        Plaintiff,

vs.

STORM CATCHER, INC. a Florida
Corporation, STORM SMART
INDUSTRIES, INC., a Florida Corporation,
STORM SMART BUILDING SYSTEMS,
INC., a Florida Corporation, STORM SMART
SALES, INC., a Florida Corporation, SMART
TRACKS, INC., a Florida Corporation,
BRIAN RIST, an Individual, and,
STEPHEN JOHNSON, an Individual,

        Defendants.
_____/

### DEFENDANTS' MOTION TO EXCLUDE AS EVIDENCE THE SURVEY, AND EXPERT REPORTS OF DR. CHARLES COWAN AND PRECLUDE HIS TESTIMONY AT TRIAL

Defendants Storm Catcher, Inc., Storm Smart Industries, Inc., Storm Smart Building Systems, Inc., Storm Smart Sales, Inc., Smart Tracks, Inc., and Brian Rist (collectively, "Defendants") submit this motion and memorandum of law in support, seeking to preclude the testimony of Charles D. Cowan, Ph.D. ("Cowan"), and exclude his expert reports, and the evidence of the survey he conducted in connection with this litigation ("the Cowan survey").

This Court should preclude Cowan's testimony and exclude his expert report because it fails to "assist the tier of fact to understand the evidence or to determine a fact in issue." Fed R. Ev. 702. Instead, Cowan's testimony, survey, and expert reports are improper and unreliable because the opinions and purported conclusions are speculative and pure conjecture. As such, the admission of Cowan's testimony, survey and expert reports would mislead and prejudice the jury and result in an improper finding of law that would constitute reversible error.

As will be discussed below, Cowan conducted an unreliable and improper survey that

1

would be of no utility to the jury in this matter, because: (a) the survey does not provide for adequate controls (b) the survey report does not provide noise analysis, which distorts the findings, and (c) the survey does not ask questions which yield responses that have a nexus to or are relevant to the issues it purports to address.  Accordingly, the Cowan Survey and expert reports should be excluded because they are erroneous and essentially of no value as evidence for the claims which they purport to address.  Similarly, Cowan's testimony at trial should be precluded because it is based on his erroneous expert reports and survey.

## STATEMENT OF FACTS

Plaintiff Armor Screen Corporation ("Plaintiff" or "Armor Screen") has brought suit against Defendants claiming, among other things, false advertising under Section 43(a) of Lanham Act [15 U.S.C. § 1125(A)] and under Section 501.204 of the Florida Statutes.  In support of the false advertising claims, Plaintiff, through counsel commissioned the firm Analytic Focus LLC, and in particular, Cowan, to conduct the Cowan Survey as well as prepare an expert report, the Expert Report of Charles D. Cowan, Ph.D. ("the Cowan Report," **Exhibit A**) based on the Cowan Survey.

Defendants commissioned Dr. Michael Rappeport, Ph.D., of RL Associates ("Rappeport") to evaluate the Cowan Survey and provide Defendants' expert witness reports and testimony.  Accordingly, Dr. Rappeport has prepared a rebuttal report entitled Perceptions of Hurricane Protection Systems ("Rappeport Rebuttal," **Exhibit B**).  Dr. Rappeport has significant experience in the field of survey evidence (See Appendix B of the Rappeport Rebuttal), and is cited by one of the leading treatises on trademark law, McCarthy on Trademarks and Unfair Competition.[1]  Rappeport's reputation as an authority in the field is such that Cowan himself has cited Rappeport in at least one article (**Exhibit C**).[2]

This is of note because the Cowan Survey aims to survey "potential purchasers of hurricane screen products" to address the following claims alleged in paragraphs 33, 34, and 35

---

[1] See 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (hereafter "McCarthy") § 32:164, FN 7 (2008); Id. at § 32:187, FN 5.

[2] Charles D. Cowan, Defining the Population vs. Finding the Population – Theory vs. Practice in Surveys Used in Litigation, available at http://ssrn.com/abstract=997791 (June 30, 2007).

2

of the original Complaint:[3]

> (paragraph 33) Storm Catcher's marketing materials for the Storm Catcher System, including statements made on its website (www.stormcatcher.com), **wrongfully imply that the Storm Catcher System received certification from Miami-Dade County or is otherwise approved for use in High Velocity Hurricane Zones** by highlighting that the Storm Catcher System is a "New Fla. Building Code Compliant product" and claiming that the Storm Catcher System "can withstand wind loads of up to 200+ mph," "passed Dade County large missile tests," and "exceeds FBC [Florida Building Code] requirements for new construction."

> (paragraph 34) The Storm Smart Entities' marketing materials for the Storm Catcher System, including statements made on their website (www.stormsmart.com), **wrongfully imply that the Storm Catcher System received certification from Miami-Dade County or is otherwise approved for use in High Velocity Hurricane Zones** by claiming that the Storm Catcher System "guards against hurricane-force winds," "meets stringent Florida Building Codes," and "has been tested to and has passed" various American Society for Testing and Materials protocols (including ASTM E1996-02: "Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes") and meets the testing protocols necessary for receiving Miami-Dade Product Approval for use in High Velocity Hurricane Zones.

> (paragraph 35) Storm Catcher, through Rist, Johnson and others acting under their direction, have sought and continue to seek to convince consumers that Storm Catcher is the innovator of the flexible wind abatement system, despite knowing that the Storm Catcher unlawfully appropriated Armor Screen's patented technology. Specifically, the aforementioned Defendants claim that the Storm Catcher System "**is the first new development in hurricane protection in over 10 years**."

Accordingly, Cowan's Expert Report presents an opinion and conclusions as to "whether consumers would be confused by or misled by statements or representations made by" the Defendants.[4] These opinions and conclusions as to the effect the Defendants' purported statements and representations have on consumers are based wholly on Cowan's Survey. As such, the Rappeport Rebuttal examines the methodology and results of the Cowan Survey as well as the findings of Cowan's Expert Report.[5] In doing so, the Rappeport Rebuttal also

---

[3] Cowan's Expert Report, Page 4 (<u>emphasis added</u>). Note: these claims now correspond to paragraphs 34, 35, and 36, respectively, of the Amended Complaint.
[4] Cowan's Expert Report, Page 2.
[5] Note: Cowan has also prepared a Supplemental Report which is directed to a discussion of damages. It is believed that said Supplemental Report was not timely submitted, and therefore should not be considered. Regardless, the

3

incorporates the results of a "partial replication" of the Cowan Survey (Rappeport's Partial Replication Survey") which further highlights the basic flaws in Cowan's methodology.

## ARGUMENT

### I. Introduction

As discussed in detail herein, Cowan conducted an unreliable and improper survey that would be of no utility to a jury in this matter, primarily because: (a) the survey does not provide for adequate controls, (b) the Cowan Report does not provide noise analysis, which distorts the findings, and (c) the survey does not ask questions which yield responses that are relevant to the issues addressed.  Accordingly, the Cowan Survey and Cowan Report are of essentially no value as evidence for the claims which they purport to address, and should therefore be excluded. Furthermore, given the nature of the claims the survey seeks to speak to, the opinions offered by Cowan by virtue of his survey, reports, and testimony would not only be useless to the jury but might potentially misinform, confuse, and prejudice the jury and more likely than not result in reversible error. As such, Cowan's survey, expert reports and all evidence relating to the same should be excluded from trial.  Similarly his testimony at trial should be precluded on the same grounds.

### II. Legal Standards Governing Admission of Expert Testimony

Rule 702 of the Federal Rules and Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to facts of the case.

Fed.R.Evid.702. This rule has been amended in response to Daubert v. Merrel Dow Pharms. Inc., 509 U.S. 579 (1993), and to the many cases applying Daubert, including Kumho Tire Co. Ltd. V.

---

Supplemental Report does not offer additional substantive analysis of the pertinent false advertising claims and only adds damages calculations to Cowan's analysis from his original report.  Therefore, said supplemental report should also be excluded because it stems from an erroneous and improper foundation.

Carmichael, 526 U.S.137 (1999) and General Elec. Co. v. Joiner, 522 U.S.136, 140 (1997).

In Daubert, the Supreme Court directed district courts to perform a screening or "gatekeeping" function to ensure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence. Daubert, 509 U.S. at 589, 597. In Kumho Tire, the Supreme Court reiterated this role and clarified that the gatekeeper function applies to all expert testimony, not just scientific testimony. Kumho Tire, 526 U.S. at 151.

To satisfy the demands made by Rule 702 and Daubert / Kumho Tire, the trial court must *first* determine that the expert opinion is reliable and "more than subjective belief or unsupported speculation." Daubert, 509 U.S at 590. The focus must be "solely on the principles and methodology, not on the conclusion that they generate." Santoro v. Donnelly 340 F.Supp. 2d 464, 472 (S.D.N.Y. 2004) (*quoting* Daubert, 509 U.S. at 597). Under Daubert the trial court must *also* determine whether the expert testimony offered is relevant in that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

Furthermore, Pursuant to Rule 403, the Court may also exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed.R.Evid.403. Finally, the proponent of an expert's testimony bears of establishing its admissibility by a preponderance of the evidence. See Figueroa v. Boston Sci. Corp., 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003).

Reliability of expert testimony can be determined by four criteria established in Daubert including: (1) whether the theory or technique can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance within the relevant scientific community. (See 509 U.S. at 593-94). The trial court must exclude expert testimony "if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996). Further, a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. Joiner 522 U.S. at 146.

With particular regard to survey evidence, in appropriate cases, the trial court may completely exclude a survey report from being received into evidence. See McCarthy § 32:158 (Citing National Football League Properties, Inc. v. Prostyle, Inc., 57 F. Supp. 2d 665, 668-670

(E.D. Wisc. 1998) (a survey report was excluded from evidence because, among other reasons, the survey failed to include a control)). Indeed, an improperly conducted survey with serious methodological defects may be excluded as irrelevant. See McCarthy § 32:170 (Citing Starter Corp. v. Converse, Inc., 170 F.3d 286, 50 U.S.P.Q.2d 1012 (2d Cir. 1999)(it was proper for the district court to exclude a survey from evidence before the jury because the survey questions were irrelevant: [A]ny probative value of the survey was outweighed by its potential to confuse the issues in the case.")

In this regard, using a "control" is critical to gaining an accurate understanding of "net confusion," which is the difference between the raw confusion percent and the control confusion percent (or "background noise"). See McCarthy § 32:187 (Citing J. Jacoby, Experimental Design and Selection of Controls in Trademark and Deceptive Advertising Surveys, 92 Trademark Rptr 890, 905 (2002)). See also McCarthy § 32:187 (Citing Reed-Union Corp. v. Turtle Wax, 77 F.3d 909, 37 U.S.P.Q.2d 1718 (7th Cir. 1996) (an apparent 25% confusion rate from one survey was marginalized when a control survey revealed a noise of 20%; thus a finding of non-infringement was affirmed). By way of analogy, McCarthy cites Rappeport, the Defendants' expert witness in this case, in noting that the use of a control "serves much the same purpose in surveying as use of a placebo does in drug testing." McCarthy § 32:187 (Citing M. Rappeport, Litigation Surveys: Social Science as Evidence, 92 Trademark Rptr 957, 986 (2002)).

### III. Flawed Methodology of the Cowan Survey

As discussed above, the Cowan Survey aims to address the false advertising claims alleged in paragraphs 33, 34, and 35 of the Complaint, which correspond to paragraphs 34, 35, and 36 of the Amended Complaint. The fist two paragraphs only differ in what they claim to be supporting evidence, and, as such, essentially make the same claim ("first claim") that Defendants' marketing materials "wrongfully imply that the Storm Catcher System received certification from Miami-Dade County or is otherwise approved for use in High Velocity Hurricane Zones." (Rappeport Rebuttal, p. 2). Cowan's survey questions (Q. 9-14) which are directed to the first claim comprise two short series of closed-end questions concerning whether the *web sites* (Q. 9-11) and *brochures* (Q. 13, 15, 16) convey:

- The advertised products have the same or different characteristics "in terms of protecting my home."

- If so, which is better (as to web site), or which would you pay more for and how much more (as to brochure).

(Rappeport Rebuttal, p. 2). In addition, Cowan asks two direct questions (Q. 12 and 14) with regard to the first claim. As discussed in more detail below, Questions 9-14 contain serious deficiencies as to a control, and also with regard to any linkage or relevancy to the issues raised.

However, with regard to Questions 15 and 16 of the Cowan Report, which appear to be directed towards damages issues,[6] Cowan discusses results which are not even aimed at any of the claims that Cowan seeks to address, and are therefore completely irrelevant. (Rappeport Rebuttal, pp. 3, 6).

Furthermore, Cowan's entire survey does not ask *any* questions with regard to the claim asserted in the third paragraph [paragraph 35 of the original Complaint] ("second claim"). For instance, Cowan does not ask anything at all about what the survey respondents think is meant by the statement, "the first new development in hurricane protection in over 10 years." (Rappeport Rebuttal, p. 3). Effectively, Cowan's survey simply does not address the second claim, and neither does his report.

With regard to the first claim, however, the Cowan Survey presents complex stimuli, each containing multiple concepts which are difficult analyze. According to Rappeport, such multi-concept presentation of information absolutely requires a questionnaire that can carefully distinguish the claims of interest from other material. As will become clear, Cowan has failed to meet this task. To begin, Rappeport summarizes the Cowan stimuli as follows:

> b) Presentation of Stimuli – Cowan presented respondents with two sets of stimuli. The first set consisted of "three panels of images and text taken directly from three websites."[4] Each of the panels contains a fairly wide variety of material. For instance, the first panel contains no fewer than six logos (in his report Cowan mentions three of these), including both accreditations and organizational memberships, over a complex statement of four sentences with each sentence presenting a separate idea. Thus the first panel alone presents the respondent with at least a half dozen different concepts. The second and third panels are similar in nature.

---

[6] Rappeport also opines that the design of the analysis is so complex, and the reported results so limited, that the results would still not be useful, even for the apparent purpose behind Questions 15-16. (Rappeport Rebuttal, pp. 3, 13).

7

(Rappeport Rebuttal, p. 4), and

> The second set of stimuli consisted of two multi-paragraph statements each covering a single-spaced, half page of type. In this case the two statements are identified as coming from a brochure of Armor and a brochure of Storm Catcher, although the brochures as a whole are not included in the report. Given their length, it is surely not surprising that there are an extensive variety of concepts in each statement.

(Rappeport Rebuttal, p. 5).

As for the Cowan Survey's questionnaire, Cowan makes essentially no use of at least twelve (12) of the twenty eight (28) total questions, including various screening and introductory questions and four demographic questions at the end of the interview. Rappeport summarizes as follows:

> The purported screening process begins with five strictly demographic questions (e.g. gender, age). Cowan then asks two questions on experience with hurricanes (have you suffered damage from a past hurricane, do you know anyone who has). With the exception of zip code, (and possibly making sure that respondents were over 16, although the detail on age is still unnecessary), none of these questions are ever used in the analysis, and the reporting on them is perfunctory, to say the least (one sentence in Cowan's paragraph 20). Once a respondent has been "qualified", Cowan proceeds to the main questionnaire. Once again Cowan makes essentially no use of the first 8 questions of the main questionnaire, with the analysis limited to reporting the results for three of the eight questions in the last sentence of Cowan's paragraph 20 and the first sentence of paragraph 21. In addition, there are still four more demographic questions at the end of the interview, none of which are used in the analysis.

(Rappeport Rebuttal, p. 5).

The Cowan Survey does, however present respondents with three "panels" which show portions of the respective web sites of Plaintiff, Defendants, and a third party, Fort Hurricane.[7] After seeing these panels, the respondents are asked the following question:

---

[7] It should also be noted that, according to Rappeport, the actual web sites are neither specified nor contained in-full in the Cowan Report which is contrary to normal practice. (Rappeport Rebuttal, p. 6).

> Q9. Which of the following statements best describes what you understand about the products offered?
>   1 The three products have the same or essentially the same characteristics in terms of protecting my home
>   2 The three products have different characteristics in terms of protecting my home
>   3 One product is better and the other two are about the same
>   4 One product is worse and the other two are about the same

If answer 3 or 4 is given, Questions 10 or 11 are asked to determine which product is perceived as "better" or "worse." The final question with regard to the panels is Question 12: "Which of these products are Miami-Dade certified for use for hurricane protection?" Unfortunately, such questions (Q. 9-12) do not establish adequate linkage or relevancy to the issues raised, especially in light of the complex stimuli presented. In other words, these questions do not carefully distinguish the claims of interest from other material. For instance, no follow-up question was asked to facilitate such a determination (such as, "why did you say that?").

In addition, the Cowan Survey presents respondents with two more "panels" taken from the respective brochures of Plaintiff and Defendants. Each panel contains substantial wording of about 300 words or so. After seeing these panels, the respondents are asked:

> Q13. Which of the following statements best describes what you understand about the products offered?
>   1 The two products have the same or essentially the same characteristics in terms of protecting my home
>   2 Product G is better than product K
>   3 Product K is better than product G

This section then continues with Question 14: "Which of these products are Miami-Dade certified for use for hurricane protection?" Here, too, such questions (Q. 13-14) do not establish adequate linkage or relevancy to the issues raised, especially in light of the complex stimuli presented.

By way of contrast, Rappeport's Partial Replication Survey asked insightful follow-up questions, such as the "why did you say that?" question after Questions 12 and 14 which both ask, "Which of these products are Miami-Dade certified for use for hurricane protection?" after the presentation of the first and second sets of panels, respectively. (Rappeport Rebuttal, p. 7).

9

Thus, in light of the foregoing, the Cowan Survey lacks questions which carefully distinguish the claims of interest from other, irrelevant material.

### IV. Flawed Results and Analysis of Cowan's Expert Report

#### A. Inadequate Control and Absence of Control Analysis

A well designed survey must incorporate some means to disentangle real world behavior from the survey artifact behavior. (Rappeport Rebuttal, p. 8). In the great majority of cases, this is accomplished through the use of controls to filter out the "noise." (Rappeport Rebuttal, p. 8).

Though the Cowan Report (paragraph 26) asserts that the "Fort Hurricane" panel was used as a control, Cowan never uses that material in a control-based analysis, and never even presents the data on the results for that control. (Rappeport Rebuttal, p. 8). For instance, when reporting on the response to Question 12, paragraph 29 of the Cowan Report simply omits the result for "Fort Hurricane." Perhaps the results of Rappeport's Partial Replication Survey reveal a possible explanation of why such information was not reported or made available by Cowan. Namely, the results for "Fort Hurricane" (26%) show a noise percentage nearly equal to the "Storm Catcher" response (29%), which yields a net noise value of just three percent (3%). (Rappeport Rebuttal, p. 9). This is similar to the statistics in Reed-Union Corp., above, wherein an apparent 25% confusion rate was marginalized when a control survey revealed a noise value of 20%. Also note that Rappeport's Partial Replication Survey was within one percentage point of the Cowan Survey for the "Storm Catcher" response (29% v. 28%):

TABLE I

First Set of Three Panels.

Question 12, "Which of these products are Miami-Dade certified for use for hurricane protection?"

|  | Cowan | Replication |
|---|---|---|
| Number Respondents | (424) | (310) |
| Armor Screen | 86% | 81% |
| Storm Catcher | 28% | 29% |
| Fort Hurricane | NA[7] | 26% |

(Rappeport Rebuttal, p. 9).

Furthermore, in the second set of panels (from the brochures), Cowan did not use any

10

control.   By contrast, when the controls of Rappeport's Partial Replication Survey are implemented, the results of Question 14 show a net noise value of just six percent (6%) for the "Storm Catcher" response versus a 22% raw response.  (Rappeport Rebuttal, pp. 10-11).  Again, the replication of the Cowan Survey, as a whole, was also successful: 75% Cowan v. 70% replicated for "Armor Screen," and 20% Cowan v. 22% replicated for "Storm Catcher." (Rappeport Rebuttal, p. 10).

### B. Other Problems in the Cowan Survey

The foregoing concerns alone present sufficient reasons for precluding Cowan's testimony.  But, in addition, Rappeport outlines several more points, as follows:

> c) Other Problems in the Cowan Survey
>
> The results of Question 9-11 and 13 are not actually directed at any of the claims made by Armor (i.e. they are not directed at the claims in paragraphs 34-36 of the first amended complaint which deals only with whether consumers perceive Storm Watcher as Miami-Dade certified).  Nevertheless, while we accordingly did not introduce any controls for these questions in our replication, in my opinion that data is not useable for any purpose.
>
> To be specific, on the basis of Questions 9-11, Cowan calculates that 60% of the respondents "said that Storm Catcher was better than or the same as Armor." Similarly using Question 13, Cowan calculates that 70% of the respondents "said that Storm Catcher was better than or the same as Armor.  Because Cowan's analysis is essentially the same for the three panel and two panel stimuli, we limit our discussion to the three panel case.
>
> First of all Cowan has made a relatively minor misstatement since what the data really says is Storm Catcher is better or has the same or substantially the same characteristics. However, the real issue is what do these results mean?  Here we can get some insight by using the same calculation scheme used by Cowan, except now with regard to Armor and Fort Hurricane.  Doing this we get

> 38% (all same) + 4% (Ft Hurricane better) + 2% (only Storm Catcher worse) = 44%
>
> That is, on the basis of the panels 44% said that Fort Hurricane had the same or substantially the same characteristics as Armor. Since Fort Hurricane is a hinge based aluminum screen system, it is clear that the meaning of "characteristics" is not what Cowan seems to think it is.
>
> However, even if Cowan had been correct in his understanding of what respondents thought they were being asked, there is still a critical problem with this question series. That problem is that at no point is the respondent asked what information in the panels makes them say which product is better or worse, or that all have essentially the same characteristics. Given the variety of information in each panel, what is clearly needed is some form of "Why did you say that?" question. Cowan really has no way of knowing what respondents understand by "characteristics", or whether their understanding has anything to do with the claim that they have been misled in very specific ways. Indeed, absent a "why did you say that" type question, Cowan really knows essentially nothing about how people understood the information in the panels.

(Rappeport Rebuttal, pp. 12-13). Accordingly, it can be seen that because the Cowan Survey failed to ask the appropriate questions, Cowan has provided no data or analysis which has any meaningful evidentiary value.

**V.     Unreliable or Irrelevant Testimony Should Be Precluded**

In light of the foregoing, it is clear that Cowan does not provide for adequate controls or noise analysis. As such, the Cowan Survey and Cowan's Expert Reports should be excluded at least on that basis. See National Football League Properties, Inc. at 668-670. See generally Reed-Union Corp. Furthermore, Cowan does not ask questions which yield responses that are probative of the issues. Moreover, Cowan has not even asked *any* questions which relate to the Plaintiff's second claim. As such, Cowan's conclusions are based on mere speculation. Accordingly, Cowan's testimony, reports and survey should be excluded for this reason alone. See Starter Corp. at 286. See also Boucher at 21.

Therefore, the Cowan Survey, Cowan's Expert Reports and testimony are of no value as

evidence for the claims which they purport to address, and should therefore be excluded/precluded under <u>Daubert</u> and its progeny. Furthermore, Cowan Survey, Cowan's Expert Reports and deposition transcript should also be excluded under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues and/or the possibility of misleading the jury. Similarly Cowan's testimony at trial should be precluded for the same reasons.

## **CONCLUSION**

For at least the foregoing reasons, Defendants respectfully request that the Court grant this motion to preclude the testimony of Charles D. Cowan, Ph.D., as well as exclude his Expert Reports and any and all evidence of the survey he conducted in connection with this litigation.

WHEREFORE, Defendants respectfully request that this Court exclude Cowan Survey, Cowan's Expert Reports and deposition testimony and preclude Cowan's testimony at trial.

Respectfully submitted,

Dated: April 10, 2009
    Miami, Florida

s/ Raquel Regalado\_\_\_\_
John Cyril Malloy, III
Florida Bar No. 964,220
jcmalloy@malloylaw.com
Peter A. Matos
Florida Bar No. 992,879
pmatos@malloylaw.com
Raquel A. Regalado
Florida Bar No. 539481
rregalado@malloylaw.com
John Fulton, Jr.
Florida Bar No. 173,800
jfulton@malloylaw.com
MALLOY & MALLOY, P.A.
2800 S.W. Third Avenue
Miami, Florida  33129
Telephone: (305) 858-8000
Facsimile:  (305) 858-0008

Attorneys for Defendants Storm Catcher, Inc., Storm Smart Industries, Inc., Storm Smart Building Systems, Inc., Storm Smart Sales, Inc., Smart Tracks, Inc., and Brian Rist.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 07-81091-CIV-RYSKAMP/VITUNAC

ARMOR SCREEN CORPORATION,
a Florida corporation,

    Plaintiff,

vs.

STORM CATCHER, INC. a Florida
Corporation, STORM SMART
INDUSTRIES, INC., a Florida Corporation,
STORM SMART BUILDING SYSTEMS,
INC., a Florida Corporation, STORM SMART
SALES, INC., a Florida Corporation, SMART
TRACKS, INC., a Florida Corporation,
BRIAN RIST, an Individual, and,
STEPHEN JOHNSON, an Individual,

    Defendants.
_____/

## CERTIFICATE OF SERVICE

    I hereby certify that on April 10, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

                                                    s/  Raquel Regalado
                                                   Raquel A. Regalado
                                                   Florida Bar No. 539481

## SERVICE LIST
ARMOR SCREEN CORPORATION v. STORM CATCHER, INC., ET AL.
United States District Court, Southern District of Florida
Case No. 07-81091-CIV-RYSKAMP/VITUNAC

Robert C. L. Vaughan
rvaughan@ssd.com
Javier A. Lopez
jalopez@ssd.com
SQUIRE, SANDERS & DEMPSEY, LLP
200 South Biscayne Boulevard
Suite 4000
Miami, Florida 33131
Telephone: (305) 577-7000
Facsimile: (305) 577-7001
Attorneys for Plaintiff.
Notices of Electronic Filing
generated by CM/ECF.

John A. Burlingame
jburlingame@ssd.com
Jeremy W. Dutra
jdutra@ssd.com
SQUIRE, SANDERS & DEMPSEY, LLP
1201 Pennsylvania Avenue NW
Suite 500
Washington, DC 20004
Telephone: (202) 626-6871
Facsimile: (202) 626-6780
Attorneys for Plaintiff.
Served via first class U.S. mail,
postage pre-paid.

Lawrence D. Smith
lsmith@waltonlantaff.com
Francis A. Scaglia
fscaglia@waltonlantaff.com
Michael R. Jenks
mjenks@waltonlantaff.com
WALTON, LANTAFF, SCHROEDER &
CARLSON, LLP
9350 South Dixie Highway
10th Floor
Miami, Florida 33156
Telephone: (305) 671-1300
Facsimile: (305) 670-7065
Attorneys for Defendant
Stephen Johnson.
Notices of Electronic Filing
generated by CM/ECF.

John Cyril Malloy, III
jcmalloy@malloylaw.com
Peter A. Matos
pmatos@malloylaw.com
John Fulton, Jr.
Florida Bar No. 173,800
jfulton@malloylaw.com
MALLOY & MALLOY, P.A.
2800 S.W. Third Avenue
Miami, Florida 33129
Telephone: (305) 858-8000
Facsimile: (305) 858-0008
Attorneys for Defendants Storm Catcher, Inc., Storm Smart Building Systems, Inc., Storm Smart Sales, Inc., Storm Smart Industries, Inc., Smart Tracks, Inc. and Brian Rist.
Notices of Electronic Filing
generated by CM/ECF.

16