**EXHIBIT A**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

## CASE NO.: 07 – 81091-CIV-RYSKAMP/VITUNAC

ARMOR SCREEN CORPORATION,
a Florida corporation,
                    *Plaintiff,*

v.

STORM CATCHER, INC.,
a Florida corporation,

STORM SMART INDUSTRIES, INC.,
a Florida corporation,

STORM SMART BUILDING SYSTEMS, INC.
a Florida corporation,

STORM SMART SALES, INC.
a Florida corporation,

SMART TRACKS, INC.,
a Florida corporation,

BRIAN RIST, an individual, and

STEPHEN JOHNSON, an individual

                    *Defendants.*

COMPLAINT FOR PATENT
INFRINGEMENT, LANHAM ACT
VIOLATIONS, DECEPTIVE AND
UNFAIR TRADE PRACTICES, AND
TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIPS

JURY DEMAND

### Expert Report of Charles D. Cowan, Ph.D.

Pursuant to 20 U.S.C. § 1746, Charles Cowan declares the following:

1. I was retained by Squire, Sanders & Dempsey L.L.P. to examine whether potential purchasers of hurricane screen products would be confused or misled by the claims of the plaintiffs, and if so whether there was a method of determining likely damages.

2.  I have personal knowledge of the matters contained in this declaration.   My background covers 30 years of research and study in the areas of statistics, economics, and their application to business problems. I am Cofounder of Analytic Focus LLC, a company headquartered in San Antonio, TX with offices in Washington, DC and Birmingham, TX.

3.  Prior to starting Analytic Focus LLC I served in the Federal government in a number of different positions in different agencies, including Chief of the Survey Design Branch for the U.S. Bureau of the Census.  I also served as a Director for Price Waterhouse where I headed the Financial Services Group in the Quantitative Methods Division.  I also hold a position as a research professor in the School of Public Health at the University of Alabama – Birmingham (UAB) and previously served as a professor in the Business School at UAB.   I've previously served as an adjunct professor of statistics at the George Washington University and the University of Illinois.

4.  A listing of my qualifications as an expert in this case are presented in Appendix 2. My complete resume and a listing of all my publications are presented in Appendix 3. A listing of past cases in which I have been deposed or presented testimony at trial is presented in Appendix 4.

### Scope of Assignment & Compensation

5.  I was asked to consider the claims made by plaintiff in the above-referenced case and to offer an opinion on whether potential consumers would be confused by or misled by statements or representations made by the defendants.  Using standard analytical techniques, I was able to determine whether consumers were confused or misled and the likely value of any misleading statements made.  This declaration considers these issues.  Compensation is at the rates set forth in the following table.

2

| Personnel | Fees per Hour |
|---|---|
| Charles Cowan, Ph.D. | $425 |
| Senior Financial Analyst | $375 |
| Senior Research Associate | $295 |
| Programmer | $195 |
| Research Analyst | $ 95 |

For expert representation, depositions and testimony, our hourly rate is $495. Out-of-pocket expenses, including travel, are billed separately and are in addition to the hourly fees.

6.   The conclusions drawn in this declaration are based on the information I had available as of the date of this report.  I recognize that there is a possibility that there is other information that could be obtained from other sources that would bear on my opinions, so I reserve the right to extend these opinions or form new opinions should new information become available.

**CLAIMS BEING ADDRESSED**

7.  Claims being investigated in this report are found in the complaint filed by the plaintiff.  In particular, the specific claims to be addressed are:

(paragraph 33)  Storm Catcher's marketing materials for the Storm Catcher System, including statements made on its website (www.stormcatcher.com), wrongfully imply that the Storm Catcher System received certification from Miami-Dade County or is otherwise approved for use in High Velocity Hurricane Zones by highlighting that the Storm Catcher System is a "New Fla. Building Code Compliant product" and claiming that the Storm Catcher System "can withstand wind loads of up to 200+ mph," "passed Dad County large missile tests," and "exceeds FBC [Florida Building Code] requirements for new construction."

(paragraph 34)  Storm Smart's marketing materials for the Storm Catcher System, including statements made on its website (www.stormsmart.com) wrongfully imply that the Storm Catcher System received certification from Miami-Dade County or is otherwise approved for use in High Velocity Hurricane Zones by claiming that the Storm Catcher System "guards against hurricane-force winds," "meets stringent Florida Building Codes," and "has been tested to and has passed" various American Society for Testing and Materials protocols (including ASTM E1996-02: "Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes") and meets the testing protocols necessary for receiving Miami-Dade Product Approval for use in High Velocity Hurricane Zones.

(paragraph 35) Storm Catcher, through Rist, Johnson and others acting under their direction, have sought and continue to seek to convince consumers that Storm Catcher is the innovator of the flexible wind abatement system, despite knowing that the Storm Catcher unlawfully appropriated Armor Screen's patented technology.  Specifically, the aforementioned Defendants claim that the Storm Catcher System "is the first new development in hurricane protection in over 10 years."

METHODS

8.  To determine if likely consumers confused the value of products based on the claims made about them, we conducted a survey in which different claims were compared.  Statements were taken directly from advertising by Storm Catcher, Armor Screen, and other hurricane protection product sellers.  These statements were presented in survey questions to respondents for comparison to determine the strength of protection promised and the types of certification that are associated with each product.  Details of the survey are presented in this section.

*Survey Mode*

9.  Sampling, questionnaire construction, and similar issues are all driven by the mode of the survey.  The survey was designed to accomplish two goals:  obtain a subset of individuals who were potential purchasers for hurricane protection products for homes, and to allow potential consumers to compare and contrast the statements made by the defendants.  Screening from the coastal U.S. population to potential consumers or users is described in the next section.

10. We chose a survey "mode" to complement our goal of testing whether consumers or purchasers were confused by statements by the defendants.  Surveys can be conducted in-person, by phone, by mail, or over the internet.  We wanted to guarantee that we would show respondents the different ads and to guarantee that all people would see and read the text of advertising by the plaintiffs and the defendants.  This meant that telephone as a survey mode was impractical and was eliminated from consideration.  Mail surveys take a great deal of time and typically have very low response rates since the mails are flooded with pseudo-surveys that are actually marketing.  In-person household surveys are prohibitively expensive.  In-person mall intercept studies are also expensive and they are difficult to use to extrapolate to the total population.

11. This leaves us with an internet survey.  The internet is used with increasing frequency for all types of surveys and they have been successfully used in trade dress litigation.  Properly designed, an internet survey can present the ads and ad text developed by the plaintiff and the defendants and be shown in multiple ways so that claims by the defendants can be addressed.

12. Cavils will be raised about the use of an internet survey in that the consumer or user is unable to touch or see the product.  However, the portion of the complaint this research is addressing is about advertising, and the advertising we are comparing has been offered on the websites of the plaintiffs and the defendant.  Furthermore, hurricane protection products are sometimes sold on the internet using pictures of the product, so it is not unusual for consumers to see claims regarding the product on the internet.

13. Similar complaints will be raised about the sample frame used for selecting the sample used in the survey.  The survey was fielded by Decision Analyst using the survey we designed. Decision Analyst maintains a sampling frame of over eight million e-mail addresses of people who have agreed to participate in surveys.  This frame has been developed over most of the last decade and Decision Analyst makes every attempt at ensuring that it covers every region of the country, diverse age groups, and is distributed in other ways to be reflective of the U.S. population.  The complaint will be raised that these are (eight million) people who have agreed in advance to be surveyed at some point and this somehow is not representative of the U.S. population since the agreement to be included in the sampling frame is given in advance of the survey.  However, tests on these surveys using mixed mode surveys (e.g. telephone and internet) have shown that there is little difference in the distribution in response on surveys like the one conducted here.

14. At the same time these complaints are being raised, we need to recognize the practical nature of the task before us – finding a projectable sample of individuals who qualify as purchasers or users of the products and showing them the ads and text for the advertising. The internet survey is the only way to accomplish this task in a scientifically reliable way.

*Population*

15. The first concern in designing the survey was determining the population to address. We asked executives at Armor Screen what their relevant market was in the United States for their product. Their response was residences and commercial buildings along the Eastern coast of the United States, extending as far north as Long Island, New York and as far South as the tip of Texas, approximately four miles south of Port Isabel, TX.

16. To define this area for a survey, we selected all zip codes along the Eastern coast of the U.S. south of Long Island, taking all residences and commercial buildings within these zip codes. Our survey population included all residences within these zip codes for a residential survey. A similar survey can be done for commercial properties.

*Sample*

17. A simple random sample of people living in these zip codes was selected and contacted to be interviewed. Respondents who worked for a marketing or advertising firm, or a construction or home improvements company were excluded from the survey, as they likely had an unusual understanding of the issues being addressed and thus were not like the general population.

18. The survey was in the field for four days and was stopped when at least 400 valid responses were obtained. More individuals than this were contacted, but with 400 responses and a steady pattern of response during the time responses came in, we were able to close the survey.

*Questionnaire Design*

19. The initial portion of the survey, the screening portion, was designed to collect information to qualify the respondent. As noted earlier, these questions determined that the respondent was 16 or over in age, not an employee of an advertising firm, a marketing firm, a construction company, or a home improvement company. The remaining individuals were deemed qualified to participate in the survey. Using the sampling frame available, we had previously determined that the respondent lived in a zip code on the Eastern coast. However, we validated the zip code to ensure the respondent still lived on the East coast. All 424 respondents were age 18 and over – no 16 or 17 year olds responded.

20. The initial questions determined whether anyone in the sample had suffered damage to their home in a hurricane, whether any respondents had shopped for a hurricane protection product, and whether any respondents mentioned shopping for hurricane screen products. Slightly over a third had suffered damage from a past hurricane, and over two-thirds knew someone who had suffered damage from a past hurricane. Over three-fourths actively do something to protect their home from an oncoming hurricane, but fewer than ten percent reported shopping for something other than plywood, masking tape, or window film to protect their home.

21. When asked about "products to protect homes from hurricane damage", over 70 percent of respondents said that certification of the product was very or somewhat important to them. At this point in the questionnaire, nothing had been said about hurricane screening products.

## RESULTS

*Confusion on Logos and Claims Made*

22. Respondents were shown three panels of images and text taken directly from three websites. The first panel showed a statement that said "Proud Members of:" and displayed images associated with the Better Business Bureau, Miami-Dade County, and the Chamber of Commerce for Sarasota, Manatee, and Venice. The lower half of the panel has text that reads:

> &&&& has received Florida Building Code Approvals (FL804 & FL6288). It also exceeded Dade County testing protocols, considered the most stringent standards in the world, withstanding winds in excess of 165 mph. By blocking 97% of the wind and rain, the &&&& performs very much like a bullet-proof vest for your home. &&&& is the first product to be approved under the "New & Innovative Products" section of the Florida Building Code.

23. The second panel showed an image of the logo for Miami-Dade County encircled by a statement that states "Miami-Dade Certified and Approved". The lower half of the panel has text that reads:

> &&&& wind abatement systems protect from wind-driven rain and flying debris better than all other methods, bar none! &&&& is Miami-Dade certified, including large missile impact and wind pressure tested to 195 PSF (276 MPH). Miami-Dade County and Florida NOA No. 07-0424.04 (exp. 1/07/2009), Florida Building Code Product Approval Nos. FL320, FL812, FL8363.

24. The third panel showed an image of a home entrance that is distressed with the implication that the damage was caused by a hurricane or high winds. The text over this picture says: "They said it couldn't be done. But we did it! At last, the world's first hurricane screen to meet Dade County hurricane specifications." The lower half of the panel has text that reads:

> The strength of our heavy-duty hinge system exceeds that of the industry standard, and the durability of aircraft-quality aluminum make this door strong enough to withstand the rigorous Metro Dade County Impact Test.
> - Dade County/Florida Building Protocol Approved
> - Florida Energy Office Certified
> - Large Missile Approved

25. These three sets of images and corresponding text were taken from websites for Storm Catcher, Armor Screen, and Fort Hurricane Products Inc. The images and text are reproduced exactly at the end of this report in Appendix 1 which gives the questionnaire. In the administration of the questionnaire, the order of the panels were randomized. With three panels, this means that the respondent saw one of six possible orderings of the panels.

26. The respondent was then asked a series of four questions about what he believed he understood from reading the Storm Catcher, Armor Screen and Fort Hurricane ads. Fort Hurricane was included as a control in this research. The sequence of questions is presented below as a flow chart so the reader can understand what was asked and of whom.

**Chart 1:  Questions about Images and Claims**



27. Responses to these questions are tabulated below.

Q_9.  Which of the following statements best describes what you understand about the products offered? {Choose One Answer}

| | |
|---|---|
| 38% | The three products have the same or substantially the same characteristics in terms of protecting my home |
| 27% | The three products have different characteristics in terms of protecting my home |
| 22% | One product is better and the other two are about the same |
| 12% | One product is worse and the other two are about the same |
| 100% | Total |

Q10.  Which product do you consider is better than the other two products? {Choose One Answer}

| % of Base | | % of Asked |
|---|---|---|
| 11% | Storm Catcher is better | 50% |
| 8% | Armor Screen is better | 34% |
| 4% | Fort Hurricane is better | 17% |
| 22% | Total | 100% |

Q11.  Which product do you consider is worse than the other two products? {Choose One Answer}

| % of Base | | % of Asked |
|---|---|---|
| 2% | Storm Catcher is worse | 15% |
| 1% | Armor Screen is worse | 6% |
| 10% | Fort Hurricane is worse | 79% |
| 12% | Total | 100% |

28. In question 9, 38% of the respondents, after examining the statements and images, stated that  the products are the same or substantially the same.  Among those who said one product is better, 11% said Storm Catcher was better than the other two.  Among those who said one product is worse, 1% said that Armor Screen was worse, and 10% implied that Storm Catcher and Armor Screen are the same since only Fort Hurricane is worse.  In total, 38%+11%+11% = 60% said that Storm Catcher was better than or the same as Armor Screen.


29. When asked "Which of these products are Miami-Dade certified for use for hurricane protection?", 86% said Armor Screen was, but an additional 28% said that Storm Catcher was Miami-Dade certified.

*Confusion on Brochures*

30. A similar type of comparison was conducted using text from two brochures, one from Armor Screen and one from Storm Catcher.  The full text shown to the respondent is presented in Appendix 1 which reproduces the questionnaire.  Text panels were shown side by side, and the order randomized so that half the time the Armor Screen was on the left and half the time it was on the right.

31. After reading the panels, respondents were asked questions similar to those above. Respondents were first asked which product was better.

Q13.  Which of the following statements best describes what you understand about the products offered? {Choose One Answer}

| | |
|---|---|
| 59% | The two products have the same or substantially the same characteristics in terms of protecting my home |
| 30% | Armor Screen is better than Storm Catcher |
| 11% | Storm Catcher is better than Armor Screen |
| 100% | Total |

32. For all respondents in the survey, 59% said the two products had the same or substantially the same characteristics, and an additional 11% said that Storm Catcher is better, for a total of 70% who believed that Storm Catcher had characteristics that were better or the same as Armor Screen.

33. Next, respondents were asked which product was Miami-Dade certified.

Q14.  Which of these products are Miami-Dade certified for use for hurricane protection? {Choose One Answer}

| | |
|---|---|
| 75% | Armor Screen |
| 5% | Storm Catcher |
| 15% | Both products |
| 5% | Neither of these |
| 100% | Total |

34. As seen from the responses, 5% believed that only Storm Catcher was Miami-Dade certified and an additional 15% believed that both were Miami-Dade certified.

35. In two different test situations, a very substantial portion of respondents believed that Storm Catcher had the same characteristics for home protection or was better at home protection.

*Specific Statements Made and Their Value*

36. From the complaint, we took specific claims made by Storm Catcher and compared them to what our understanding was of the actual characteristics of Storm Catcher. Because of the number of claims made, we could not show all the claims at the same time to a respondent, so we divided the claims into three groups and selected one from each group for contrast. This resulted in nine sets of comparisons which were administered at random to the respondents.

37. Respondents were shown the claims made by Storm Catcher and the corresponding actual characteristics in two sets of statements. These comparisons were randomized so that Storm Catcher statements were presented first in half the comparisons. After the two sets of claims were shown, the question was asked: "Based on your understanding of the performance of each of these products from these statements, would you pay more for Product X than for Product Y?". Of the 424 respondents, 48% said they would not be willing to pay more for one than for the other. The remaining 52% were asked a question regarding how much more.

38. Installations for a whole home for Armor Screen range between a few thousand dollars to over $100,000, depending on the size of the house. Some customers only buy protection for their house for a few windows or a door. To guarantee all respondents consider the same situation and costs, we asked a question specific to one window and its possible cost. We also considered that the cost of even a single window could vary depending on the way the screen was attached to the house, so we varied the cost suggested for an installation to allow for this. Costs for a single window installation were provided by Armor Screen at our request.

39. We asked:

> Q16. *The average cost for a flexible hurricane screen system for a window 2½ feet by 4 feet is ($150, $210, $270, $330). Thinking back to the description you just read, how much more would you be willing to pay for a flexible hurricane screen that meets more stringent requirements? {Choose One Answer}*

and eleven possible responses were offered, ranging from $3.00 to $33.00. Using the responses obtained and taking these responses relative to the cost suggested ($150, $210, $270, or $330) we computed that the average additional amount a respondent would pay. This additional amount is the amount a respondent would pay for the characteristics claimed by Storm Catcher relative to the reduced set of claims. The full set of comparisons is found in Appendix 1.

40. Our estimate of the additional amount a respondent would pay is $0.041 per total dollar spent. This includes zero additional paid for the 48% of the respondents who said they would not pay more. Note that this is the MINIMUM additional that a respondent would pay, since each respondent was only shown three claims. In most cases, Storm Catcher made more than three additional claims, each with it's own unique value. However, determining the additional value of more than three claims is not something we tested. We would expect that additional claims would have diminishing value so our additional value computed is only for three claims made.

41. Note also that this is 4.1 cents per dollar total revenue, not EBITA or profits. Respondents were told the total cost they would be paying and asked how much additional they would pay for the product with the additional claims. Computation on a smaller amount on an accounting basis in not relevant since it is not something the respondent considered.

42. The conclusion is that, if the claims allegedly made by Storm Catcher in its advertising, as presented in the complaint, are not true, then the value of these claims is a minimum of 4.1 cents per dollar of total revenue.  This is only for the additional amount that would be paid for Armor Screen and does not include lost revenues due to business diverted from Armor Screen to Storm Catcher.  If Armor Screen had to lower its prices to compete against false claims, this could be considered that portion of lost revenue and a further indicator that some portion of business was lost because of these claims.

### CONCLUSIONS

43. The evidence from the survey is overwhelming that respondents were confused between the characteristics or properties of the two products.  A very large portion of the sample (> 70%) stated that Storm Catcher was the same as or better than Armor Screen based on the claims made by Storm Catcher.   A large portion of the sample (> 20%) believes that Storm Catcher is Miami-Dade certified based on its claims.  From the claims made, it appears that Armor Screen had to lower its prices to counteract the claims of Storm Catcher by at least 4.1 cents per dollar total revenue, and that there would be further loss from lost sales.

44. There is significant financial damage suffered by Armor Screen as a result of the claims made by Storm Catcher.

45. Note that this calculation is an "additional" diversion of sales that would be due to false claims and deceptive practices.  There is already a diversion of sales due to the patent infringement, so any calculation I would do would necessarily be unduplicated from the sales diversion calculations made by the patent damages expert.  Since I have not seen any of the

materials used by the patent damages expert nor his report, I am not prepared to provide unduplicated numbers.

46. Further analysis is required to calculate damages. I anticipate receiving information from the patent damages expert and other sources regarding timing, the history of sales, revenues, expenditures on advertising, and pricing for both Armor Screen and for Storm Catcher. An event history analysis, similar to the "but for" analysis commonly used in antitrust cases, would indicate what the additional diversion of sales would be.

**Signature:**

Charles D. Cowan, Ph.D.

Managing Partner

Analytic Focus LLC

**APPENDIX 1:  Questionnaire**

**HURRICANE WINDOW PROTECTION (n=400)**

*(SAMPLE:  PULL FROM ZIP CODE LIST PROVIDED. EXCLUDE ADVERTISING, MARKETING RESEARCH AND MARKETING. AGES 16+)*

---

Dear (firstname):

Thanks for agreeing to complete this brief screening questionnaire.

As soon as you respond, the panel member's name will be entered into a drawing for $10,000 in monthly cash awards for participating in this screener. Winners of this drawing will receive a check in the mail within four weeks.

Your individual answers will be anonymous and strictly confidential, of course.  Once you have answered all of the questions on a page, please click on the "Next Page" button.

---

**PLEASE READ EACH QUESTION CAREFULLY.  PLEASE ANSWER *EVERY* QUESTION.**

S1. **Are you?**  {Choose One Answer}

<u>SR</u>
1       Male
2       Female

S2. **What is your age?**  {Choose One Answer}

<u>SR</u>
01      Under 16 (DNQ1)
02      16 to 17
03      18 to 24
04      25 to 29
05      30 to 34
06      35 to 39
07      40 to 44
08      45 to 49
09      50 to 54
10      55 to 59
11      60 to 64
12      65 to 69
13      70 to 74
14      75 or older

(INSERT PAGE BREAK)

S3. **Please type in the zip code of your <BLUE: primary> residence.** {Please Type The Number In The Box Below}

    <u>NO</u>

(VALIDATE ZIP CODE)
(VERIFY ZIP CODE ENTERED MATCHES ZIPCODE PROVIDED BY SAMPLE; OTHERWISE DNQ2)

(INSERT PAGE BREAK)

S4. **Do you, or does any member of your household, currently (or in the past three years) work full-time or part-time for any of the following?** {Choose All Correct Answers} (RANDOMIZE)

    <u>MR</u>
1    An advertising agency  (DNQ)
2    A market research company or department  (DNQ)
3    A marketing company (DNQ)
4    A company that manufactures, distributes or sells sports equipment
5    A company that manufactures, distributes or sells home protection products (DNQ)
6    A professional remodeling company (DNQ)
7    None of the above (DNR)

    (MUST NOT ANSWER CODES 1, 2, 3, 5 OR 6, OTHERWISE DNQ3)

(INSERT PAGE BREAK)

S5. **What type of dwelling do you live in?** {Choose One Answer} (RANDOMIZE)

    <u>SR</u>
1    Single-family house
2    Duplex, triplex, or quadruplex
3    Condo
4    Apartment
5    Dormitory
6    Other (Please Type In The Other Type Of Dwelling) (DNR)     *(VERBATIM)*

(INSERT PAGE BREAK)

S6. **Have you suffered damage to your residence from a past hurricane?** {Choose One Answer}

    <u>SR</u>
1    Yes
2    No
3    Don't know

S7.   **Do you know of other people who have suffered damage to their home from a past hurricane?** {Choose One Answer}

<u>SR</u>
1        Yes
2        No
3        Don't know

S8.   **For quality-control purposes, please select "Bird" from the list below.**
(RANDOMIZE) {Choose One Answer}

<u>SR</u>
1        Dog
2        Cat
3        Bird
4        Hamster
5        Rabbit
6        Gerbil

(MUST SELECT CODE 3 IN S8; OTHERWISE DNQ998)

(OVER QUOTA, DNQ4)

(RANDOM ASSIGN RESPONDENT TO CELL – CONCEPT PAIRS)
(ASSIGN RESPONDENT TO BASE-PRICE BASED ON LEAST FILL)

---

**QUALIFICATIONS:**

S2 Codes 02 to 14: Ages 16 or older
S3 Zip code entered = Zip code provided
S4 Not codes 1,2,3,5 or 6: Security Question
S8 Code 3: Cheater Question

---

**[IF RESPONDENT DOES NOT QUALIFY]**

Thanks for completing this screening questionnaire.  The panel member's name has been entered into a drawing for $10,000 in monthly cash awards for participating in this screener. Winners of this drawing will receive a check in the mail within four weeks.

If you are selected to participate in the survey, we will notify you by email within one week.

Thanks for your help!

Anne Parks
Vice President
American Consumer Opinion®

**[IF RESPONDENT DOES QUALIFY]**

Thanks for completing this screening questionnaire.  The panel member's name has been entered into a drawing for $10,000 in monthly cash awards for participating in this screener. Winners of this drawing will receive a check in the mail within four weeks.

You are invited to participate in a survey.  It will take about 12 minutes to finish.  The panel member will receive a check for $4.00 if the following questionnaire is completed by the date specified in our email.

Your individual answers will be anonymous and strictly confidential, of course. Once you have answered all of the questions on a page, please click on the "Next Page" button.

**(QUESTIONNAIRE)**

**Please answer the following questions, and be as honest and truthful as possible.**

**Q1.     If a hurricane is coming in the direction of the area where you live, do you do anything to     protect your home?** {Choose One Answer}

<u>SR</u>
1          Yes
2          No

(INSERT PAGE BREAK)

**Q2.     What types of products are you aware of that would be used for home protection from a hurricane?** {Please Type Your Answers In The Box Below.  Please Be Specific And Include Details.}

<u>TO</u>

(CODE AND VERBATIM)

(INSERT PAGE BREAK)

(ASK IF Q1 CODE 1; OTHERWISE, SKIP TO Q4)
**Q3.     How do you protect your home in the event of a hurricane?** {Choose All Correct Answers}

<u>MR</u>
1          Tape up windows
2          Use plywood to board up windows
3          Apply hurricane window film
4          Hurricane shutters
5          Other (Please Type In The Other Method)      (CODE)

(INSERT PAGE BREAK)

**Q4.     Have you ever shopped for any hurricane home protection products?** {Choose One Answer}

<u>SR</u>
1          Yes
2          No
3          Don't know

(INSERT PAGE BREAK)

(ASK IF Q4 CODE 1; OTHERWISE SKIP TO Q6)

Q5.    **Which hurricane protection products have you ever shopped for?**  {Choose All Correct Answers}

MR
1          Masking or duct tape for windows
2          Plywood to board up windows
3          Hurricane window film
4          Hurricane shutters
5          Other (Please Type In The Other Protection Product)   | (CODE) |

(INSERT PAGE BREAK)

Some products are certified by an independent organization concerned with consumer safety. For example, Underwriters Laboratory is the organization that brings us the "UL" tags on almost all electrical products that we buy.

Q6.    **Is a certification something you look for when you buy a product?**  {Choose One Answer}

SR
1          Yes
2          No
3          Depends on the product I'm shopping for
4          Don't know

(ASK IF CODE 3 IN Q6; OTHERWISE, SKIP TO Q8)
Q7.    **For what types of products would you look for a certification?**  {Please Type Your Answers In The Box Below}

TO
| (VERBATIM) |

(INSERT PAGE BREAK)

     (ASK IF CODES 2, 3 OR 4 IN Q6; OTHERWISE, SKIP TO Q9)
Q8.    **Now consider products to protect homes from hurricane damage.  How important would certification for these products be to you?**  {Choose One Answer}

SR
1          Very important
2          Somewhat important
3          Not very important
4          Not at all important

(INSERT PAGE BREAK)

Now we would like to introduce you to three different hurricane protection products.  Please review the products' certifications and carefully read the products' descriptions:

(PROGRAMMER:  RANDOMIZE ORDER OF THE THREE COLUMNS; SHOW ABOVE Q9 THROUGH Q12)

| Product P | Product Q | Product R |
|---|---|---|
| **Proud Members of:**<br> | | |
| &&&& has received Florida Building Code Approvals (FL804 & FL6288). It also exceeded Dade County testing protocols, considered the most stringent standards in the world, withstanding winds in excess of 165 mph. By blocking 97% of the wind and rain, the &&&& performs very much like a bullet-proof vest for your home. &&&& is the first product to be approved under the "New & Innovative Products" section of the Florida Building Code. | &&&& wind abatement systems protect from wind-driven rain and flying debris better than all other methods, bar none! &&&& is Miami-Dade certified, including large missile impact and wind pressure tested to 195 PSF (276 MPH).  Miami-Dade County and Florida NOA No. 07-0424.04 (exp. 1/07/2009), Florida Building Code Product Approval Nos. FL320, FL812, FL8363. | The strength of our heavy-duty hinge system exceeds that of the industry standard, and the durability of aircraft-quality aluminum make this door strong enough to withstand the rigorous Metro Dade County Impact Test.<br>• Dade County/Florida Building Protocol Approved<br>• Florida Energy Office Certified<br>• Large Missile Approved |

**Q9.    Which of the following statements best describes what you understand about the products offered?** (RANDOMIZE)  {Choose One Answer}

<u>SR</u>
1          The three products have the same or substantially the same characteristics in terms of protecting my home
2          The three products have different characteristics in terms of protecting my home
3          One product is <BOLD/BLUE: better> and the other two are about the <BOLD/BLUE: same>
4          One product is <BOLD/BLUE: worse> and the other two are about the <BOLD/BLUE: same>

(INSERT PAGE BREAK)

(ASK IF Q9 CODE 3; OTHERWISE SKIP TO Q11)
**Q10.   Which product do you consider is <BLUE: better> than the other two products?**
(RANDOMIZE SAME AS COLUMNS) {Choose One Answer}

<u>SR</u>
1          Product P is better
2          Product Q is better
3          Product R is better

(INSERT PAGE BREAK)

(ASK IF Q9 CODE 4; OTHERWISE SKIP TO Q12)
**Q11.   Which product do you consider is <BLUE: worse> than the other two products?**
(RANDOMIZE SAME AS Q10) {Choose One Answer}

<u>SR</u>
1          Product P is worse
2          Product Q is worse
3          Product R is worse

(INSERT PAGE BREAK)

**Q12.   Which of these products are Miami-Dade certified for use for hurricane protection?** (RANDOMIZE SAME AS Q10) {Choose All Correct Answers}

<u>MR</u>
1          Product P
2          Product Q
3          Product R
4          None of these (DNR)

(INSERT PAGE BREAK)

Please Read the Following Two Statements About Two Products Being Offered for Hurricane Protection.

(PROGRAMMER:  RANDOMIZE ORDER OF THE TWO COLUMNS)

## Product G                         Product K

**THE ORIGINAL PATENTED FABRIC HURRICANE PROTECTION!**
**Transparent, Lightweight, Easy to Deploy and Unbelievably Strong.**

Miami-Dade approved in January 2000, including High Velocity Hurricane Zone.  Florida building code approved.  The patented &&&&® System offers an innovative and economical alternative to traditional rigid hurricane protection.

&&&& founders invented, designed, and brought to market this unique and highly engineered product. &&&& is now in its tenth year of production.  Nominated for the Florida Governor's award for innovation in technology, supported by emergency management personnel – the &&&&® System provides a state-of-the-art alternative against destructive wind forces and horizontal driving rain intrusion.

Don't be left in the dark.  See what's happening with &&&&.
• Unique interwoven design provides an excellent barrier to high winds and driving rain, yet you can see right through it.
• Replace the "dark cave effect" with natural light
• No more being trapped behind your hurricane protection
• Put your hurricane protection up ahead of time, without having to wait until the last minute
• Stay functional and accessible right up to the storm and open immediately after.

Freedom of design for architects, with strength respected by engineers.  Applications that are impossible with other products are accomplished with &&&&.  Shelters, fire rescue stations, auto dealerships, airports, store fronts, lanais and sliding glass doors are easily protected. Since &&&& is flexible, it can be adapted to most architectural details.

&&&& is lightweight and easy to deploy. It can be put up without tools, in a fraction of the time required for other products. Utilize existing staff and eliminate the need to hire outside labor.

&&&& is Large Missile Miami-Dade Approved (High Velocity Hurricane Zone).  &&&& is Miami-Dade certified including large missile impact and wind pressure tested to 195 PSF (276 MPH).

NOA No. 03-1204.1, Florida Building Code Product Approval Nos. FL320, FL812, FL8363.

**FORT MYERS COMPANY GETS STATE-WIDE APPROVAL FOR &&&&® , #FL804**

The Florida Building Commission approved &&&&® Hurricane Wind Abatement Systems for state-wide use. This product was the first to be approved under the category of "New and Innovative Envelope Products" with the Florida Building Commission.

The &&&&® screen is a lightweight, geo-synthetic fabric used to protect buildings from hurricane force winds and driving rain. It is ideal for protecting large openings such as lanais, store fronts, windows and entrance ways. &&&&® is also an ideal way to cover garage doors as an alternative to the cost of a hurricane door.

This product is engineered to be a low-cost alternative and it is thought to be the first new development in hurricane protection in over a decade.  Due to its light weight, the screen can be installed by anyone. Most applications require no special tools or heavy lifting. It is ideal for today's large, irregularly shaped lanais and conquers design challenges experienced with other products.

Our team has been developing hurricane protection for over 15 years. We hope that you will make &&&&® valued additions to your line of defense in protecting your home.
                    * Not for use in HVHZ

**"It's Like a Bulletproof Vest for Your Home."**

The &&&&® Hurricane Wind Abatement System is considered the newest and most innovative product in the world of hurricane protection. The &&&&® screen truly is like a bulletproof vest for your home. Having received Florida Building Code and Texas Department of Insurance approvals, &&&&® offers you peace of mind while still having full visibility from within your home.

• BLOCKS 97% OF WIND & RAIN
• ZERO MAINTENANCE
• EASY STORAGE
• FLORIDA BUILDING CODE APPROVAL #FL805 & #FL6288
• TEXAS DEPARTMENT OF INSURANCE

**Q13.   Which of the following statements best describes what you understand about the products offered?** {Choose One Answer}

<u>SR</u>
1         The two products have the same or substantially the same characteristics in terms of protecting my home
2         Product G is <BLUE: better> than product K
3         Product K is <BLUE: better> than product G

**Q14.   Which of these products are Miami-Dade certified for use for hurricane protection?** {Choose One Answer}

<u>SR</u>
1         Product G
2         Product K
3         Both products
4         Neither of these

(INSERT PAGE BREAK)

The next few questions are about home protection products similar to those you saw in the previous advertising.  These products are screens composed of heavy duty geo-synthetic fabrics.  These screens can be used to cover windows, doors, and other exposed parts of a building in the event of a hurricane.

We want to know about geo-synthetic screening systems that you might consider purchasing for your home.  Product X has advertising or statements in its materials explaining that Product X has the following qualities:

(INSERT FIRST CONCEPT BASED ON CELL)

The same type of product, Product Y, has advertising or statements in its materials explaining that Product Y has the following qualities:

(INSERT SECOND CONCEPT BASED ON CELL)

**Q15.   Based on your understanding of the performance of each of these products from these statements, would you pay more for Product X than for Product Y?** {Choose One Answer}

<u>SR</u>
1         Yes
2         No
3         Don't Know

(INSERT PAGE BREAK)

(ASK IF Q15 CODE 1 OR 3; OTHERWISE SKIP TO Q17)

(SHOW CODES 1, 3, 5, 6 IF CELL 01, 05, 09, 13, 17, 21, 25, 29, 33, 37, 41, 45, 49, 53, 57, 61, 65, 69)

(SHOW CODES 2, 5, 7, 9 IF CELL 02, 06, 10, 14, 18, 22, 26, 30, 34, 38, 42, 46, 50, 54, 58, 62, 66, 70)

(SHOW CODES 4, 6, 9, 11 IF CELL 03, 07, 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 51, 55, 59, 63, 67, 71)

(SHOW CODES 5, 8, 10, 12 IF CELL 04, 08, 12, 16, 20, 24, 28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 68, 72)

(ALWAYS SHOW CODE 13)

**Q16.   The average cost for a flexible hurricane screen  system for a window that is 2½ feet by 4 feet is (<blue: IF CELL 01, 05, 09, 13, 17, 21, 25, 29, 33, 37, 41, 45, 49, 53, 57, 61, 65, 69: $150, IF CELL 02, 06, 10, 14, 18, 22, 26, 30, 34, 38, 42, 46, 50, 54, 58, 62, 66, 70: $210, IF CELL 03, 07, 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 51, 55, 59, 63, 67, 71: $270, IF CELL 04, 08, 12, 16, 20, 24, 28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 68, 72: $330)>.  Thinking back to the descriptions you just read, how much more would you be willing to pay for a flexible hurricane screen that meets the more stringent requirements? {Choose One Answer}**

<u>SR</u>
| | |
|---|---|
| 01 | $  3.00 |
| 02 | $  6.00 |
| 03 | $  9.00 |
| 04 | $ 12.00 |
| 05 | $ 15.00 |
| 06 | $ 18.00 |
| 07 | $ 21.00 |
| 08 | $ 24.00 |
| 09 | $ 27.00 |
| 10 | $ 30.00 |
| 11 | $ 33.00 |
| 12 | Don't know |

(INSERT PAGE BREAK)

The Following Questions Are For Statistical Purposes Only. Your Answers Will Be Treated As Strictly Confidential.

Q17.   **What is your marital status?**  {Choose One Answer}

<u>SR</u>
| | |
|---|---|
| 1 | Married |
| 2 | Living with someone |
| 3 | Single, never married |
| 4 | Divorced/Separated |
| 5 | Widowed |

**Q18.   Which of the following employment categories best describes you?** {Choose One Answer}

<u>SR</u>
1       Employed full-time
2       Employed part-time
3       Retired
4       Homemaker, not working outside the home
5       Student, not working
6       Unemployed
7       Other

**Q19.   What is your household's approximate annual income before taxes?** {Choose One Answer}

<u>SR</u>
1       Less than $25,000
2       $25,000 to $34,999
3       $35,000 to $49,999
4       $50,000 to $74,999
5       $75,000 to $99,999
6       $100,000 to $124,999
7       $125,000 or more

**Q20.   What is your educational background?** {Choose One Answer}

<u>SR</u>
1       Less than high school
2       High school graduate
3       High school and some college
4       Bachelor's degree
5       Bachelor's degree and some post-graduate work
6       Post-graduate degree

**(Once You Have Answered All Of The Questions Above,
Please Click On The "SUBMIT" Button Below.)**

| SUBMIT |
|---|

SURVEY COMPLETED!

Thanks for completing this survey.  The panel member will receive a check for $4.00 within the next four weeks.

Thanks again for your help!

Anne Parks
Vice President
American Consumer Opinion®

**Concepts/Cells**

| 1 | A | Can withstand wind loads of up to 200+ mph |
| | B | Exceeds FBC [Florida Building Code] requirements for new construction. |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 2 | A | Can withstand wind loads of up to 200+ mph |
| | B | Meets stringent Florida Building Codes |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 3 | A | Can withstand wind loads of up to 200+ mph |
| | B | Meets the testing protocols necessary for receiving Miami-Dade Product Approval for use in High Velocity Hurricane Zones |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 4 | A | Passed Dade County large missile tests |
| | B | Exceeds FBC [Florida Building Code] requirements for new construction. |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 5 | A | Passed Dade County large missile tests |
| | B | Meets stringent Florida Building Codes |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 6 | A | Passed Dade County large missile tests |
| | B | Meets the testing protocols necessary for receiving Miami-Dade Product Approval for use in High Velocity Hurricane Zones |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 7 | A | Guards against hurricane-force winds |
| | B | Exceeds FBC [Florida Building Code] requirements for new construction. |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 8 | A | Guards against hurricane-force winds |
| | B | Meets stringent Florida Building Codes |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

| 9 | A | Guards against hurricane-force winds |
| | B | Meets the testing protocols necessary for receiving Miami-Dade Product Approval for use in High Velocity Hurricane Zones |
| | C | Has been tested to and has passed various American Society for Testing and Materials protocols including ASTM E1996-02: Standard Specification for Performance of Exterior Windows, Curtain Walls, Doors and Storm Shutter Impacted by Windborne Debris in Hurricanes |

**Concepts/Cells**

| 11 | A | can withstand wind loads of up to 120+ mph |
| | B | meets FBC [Florida Building Code] requirements |
| | C | meets various testing protocols for high wind situations |

| 12 | A | can withstand wind loads of up to 120+ mph |
| | B | meets stringent Florida Building Codes |
| | C | meets various testing protocols for high wind situations |

| 13 | A | can withstand wind loads of up to 120+ mph |
| | B | |
| | C | meets various testing protocols for high wind situations |

| 14 | A | |
| | B | meets FBC [Florida Building Code] requirements |
| | C | meets various testing protocols for high wind situations |

| 15 | A | |
| | B | meets stringent Florida Building Codes |
| | C | meets various testing protocols for high wind situations |

| 16 | A | |
| | B | |
| | C | meets various testing protocols for high wind situations |

| 17 | A | guards against high velocity winds |
| | B | meets FBC [Florida Building Code] requirements |
| | C | meets various testing protocols for high wind situations |

| 18 | A | guards against high velocity winds |
| | B | meets stringent Florida Building Codes |
| | C | meets various testing protocols for high wind situations |

| 19 | A | guards against high velocity winds |
| | B | |
| | C | meets various testing protocols for high wind situations |

**APPENDIX 2:  PAST EXPERIENCE**

My background covers 30 years of research and study in the areas of statistics, economics, and their application to business problems.  I am Managing Partner of Analytic Focus LLC, a company headquartered in Birmingham, Alabama.  A portion of our work is conducting research in legal issues, including providing litigation support and expert witness services when requested.  Some of our work focuses on measurement and mitigation of risk for financial intermediaries.  The final area of our practice is in support of Federal and State agencies needing economic and financial analysis to pursue their missions.  I am also a research professor in the School of Business and the School of Public Health at the University of Alabama – Birmingham.

In litigation, our firm has focused on class certification issues, intellectual property, antitrust, and regulatory compliance.  In banking and insurance, we offer services regarding audit reliability, risk measurement, model validation, and optimization of operations.  For regulatory agencies, we have contracts with several Federal agencies to determine risk to funds managed by the agencies or operations conducted by the agencies.

Prior to founding Analytic Focus, I was a director for ARPC, a firm in Washington, DC where I provided many of the same services currently offered by Analytic Focus.  From the beginning of 1997 through the end of 1999, I was a Director for Price Waterhouse and subsequently PricewaterhouseCoopers.  In this position I headed up two different staff groups, one the financial research group in the Survey Research Center (SRC) run by Price Waterhouse, the other the data mining group.  Our research efforts in the SRC was in support of business to business consumer research and financial analysis and for the Federal Government to research regulatory impact.  In the data mining group we provided fraud detection services for financial services organizations, optimization research for businesses concerned with supply chain issues in production, and analysis of delivery systems for a number of major delivery companies.  This latter work required coordination with our supply chain group and the three directors in charge of these operations formed an "Analytical Trust" where we worked jointly on the statistical and financial aspects of the design for these programs.  On the whole, we combined resources in this small group in operations research, statistics, mathematical economics, finance, and system design to answer complex analytical questions.

Before joining Price Waterhouse, I was Chief Statistician for the Federal Deposit Insurance Corporation and the Resolution Trust Corporation, where I was responsible for all research on valuation of properties and assets taken in by the FDIC and RTC in the banking crisis of the 1980s and 1990s.  I also supported research into fraud, optimization of contracts with servicing companies, and consumer perceptions of their interactions with banks and savings and loans.  I prepared and jointly presented results on the FDIC's consumer research to Congress, specifically the House Banking Committee in hearings on how consumers perceive what they are told regarding retail transactions in banks.

During this time, 1991 to 1996, I also served on a number of independent review committees for different Federal agencies to evaluate the quality of research conducted or research proposed for the National Institutes of Health, for the Department of Health and Human Services, for the Department of Justice, for Treasury, and for the Department of Agriculture.  These committees were formed specifically to determine how to determine whether research presented to the Federal government could support conclusions drawn or to consider whether research proposed in grant applications would be adequate to study the topic in question.

I also worked for a time in the private sector as Chief Statistician and a Vice President for Opinion Research Corporation, from 1989 through 1991. In this position I helped design over 100 consumer research studies focusing on acceptance of new products, pricing, and customer satisfaction. In particular I helped to design the largest ongoing customer satisfaction study conducted in the United States for the U.S. Postal Service to investigate all aspects of consumer reactions to operations of and interactions with the Postal Service.

From 1986 through 1989, I was the first Chief Statistician for the newly founded National Center for Education Statistics, an agency within the Department of Education. As the Chief Statistician I was responsible for the design of all surveys and research conducted by NCES, reports to Congress on the state of education in the U.S. and in the world, and on staff development in research methods. In particular, under my guidance, NCES was one of the first Federal statistical agencies to publish standards for operations and research. These standards are still required for the conduct of research by all NCES staff and all contractors working with the NCES.

From 1975 through 1986 I held a variety of positions at the U.S. Bureau of the Census, including Chief of the Survey Design Branch, where I was responsible for the technical aspects of all research conducted on the evaluation of surveys and the 1980 Decennial Census. I also designed research studies on the validity of surveys conducted by the Census Bureau, experiments to measure response validity, and helped a number of countries develop research programs regarding their economic and demographic research programs.

My first positions after graduation were with the Institute for Social Research at the University of Michigan and as Manager of the Survey Research Center at Oregon State University.

During this time I served on a number of different committees in professional associations including the American Statistical Association, the American Association for Public Opinion Research, and the Research Industry Coalition, including the presidency of the latter. For each of these associations I was involved in issues of ethics and professional standards in the research community.

I have also served as an adjunct or visiting professor at a number of universities, besides my current positions as an adjunct at UAB. I have also been an adjunct professor teaching statistics at the George Washington University and a visiting research professor at the University of Illinois.

**APPENDIX 3:  RESUME**



**CHARLES D. COWAN, Ph.D.**
ANALYTIC FOCUS LLC

*Key Qualifications*
Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC.  Dr. Cowan has 30 years of experience in statistical research and design.  He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department.  He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls.  During the 1990s, there were hundreds of thousands of assets taken into receivership when financial institutions failed, and these assets varied from large commercial loans to the furniture and fixtures of the institutions itself.  Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures.  These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting, leading these agencies to their first clean opinions from the GAO in their annual review of agency financial statements.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems.  These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC.  These sampling techniques have also been applied in banks and the audit of other Federal agencies concerned with regulatory review of operations and systems, such as regulatory reporting forms, accounts payable and receivable, travel records, and litigation related systems for banks, regulatory agencies, and law firms;

- Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans.  These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, and also for nonprofit institutions, and for defendants in several lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Incorporation of population demographic models with financial assessment models to predict risk for insurance companies and corporations in terms of number and value of potential claims in mass tort litigation.

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing.  These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census,  use of network sampling  as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.


Dr. Cowan teaches graduate and undergraduate courses in survey methods,  statistics, and computer methods for analysis.  He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research, survey research, and audit sampling.  From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's and capitalization requirements for the RTC funds from the U.S. Treasury.  Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T.  Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

*Education*
Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and Economics, The University of Michigan, 1972

**PROFESSIONAL EXPERIENCE**
Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.
Director, ARPC, November, 1999 to December, 2001.
Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.
Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.
Chief Statistician, Opinion Research Corporation, 1989 to 1991.
Chief Statistician, National Center for Education Statistics, U.S. Department of Education, 1986
    to 1989.
Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984
    to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design
    Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and
    Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief,
    Statistical Research Division, 1975 to 1976
Survey Research Center, Oregon State University: Manager, 1974 to 1975
Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.

*Professional Associations*
Adjunct Professor, Statistics, University of Alabama – Birmingham, 2002-2004.
Associate Professor, Statistics, George Washington University, 1993 - 1998.
Visiting Research Professor, Survey Research Laboratory, U. of Illinois, 1983 - 1989.
Consultant, Dept. of Community Psychiatry, Johns Hopkins U., July 1985 - Dec 1987.

*Professional Societies - Positions*
President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of American Association for Public Opinion Research
    (AAPOR), 1998
Program Chair, American Association for Public Opinion Research, 1991-2
Program Chair, Section on Survey Research Methods, American Statistical Association (ASA),
    1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

*Professional Societies – Memberships*
American Statistical Association
International Association of Assessment Officers

*Publications*

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection:  Some Considerations", Proceedings of the Computer Science and Statistics: Eleventh Annual Symposium on the Interface, 1978.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Survey", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1978.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection:  A Practical Application Using Census Data", Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81, # 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. The Effects of Misclassification on Estimates from Capture-Recapture Studies.  Unpublished doctoral dissertation, The George Washington University, September 1984.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", Proceedings of the Fourth Annual Research Conference (ARC IV), U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data: Recent Trends in Mortality Rates", Journal of the National Cancer Institute, Vol. 84, No. 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in Homelessness, Health, and Human Needs.  Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government:  Practices in the Center for Education Statistics", Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", Science, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials:  The Philosophy of Inference from Different Types of Research Designs" in Marketing Research: A Magazine of Management & Applications, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts:  Principles of Design for Research" in Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop, September, 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in Housing Policy Debate:  Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in Proceedings of the Section on Survey Research Methods, American Statistical Association, 1992.

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in Controlled Clinical Trials, Vol.15, pp.24-29, 1994.

Cowan, Charles D., and Klena, Matthew K. "Use of the EM Algorithm for Allocation of Proceeds from Auctions and Bulk Sales" in Proceedings of the Section on Business and Economic Statistics, American Statistical Association, 1995.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in Journal of Drug Issues, October, 2001.

Cowan, Charles D.,  "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in Proceedings of the International Association of Assessment Officers, October, 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation:  An Empirical Investigation of a Subprime Lender",  The Journal of Banking and Finance, March 2004.

Cowan, Charles D. and Cowan, Adrian M.,   "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", SBA Report 283, November 206

Keith, Scott W. , Wang, Chenxi, Fontaine, Kevin R. , Cowan, Charles D.  and Allison, David B. , "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", Obesity, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Charles D., and Cowan, Adrian M., "Quasi-Likelihood Estimation of Loan Portfolio Defaults in the Presence of Default Correlation and Autocorrelation", The European Journal of Finance (forthcoming, 2008)

## APPENDIX 4:  PAST TESTIMONY

### PAST EXPERIENCE – CHARLES D. COWAN

*Trademark Infringement:*
Quiksilver v. Brunswick, circa 1997.  Deposed, case settled. Worked for the defendant, who had started producing t-shirts under brand name Quicksilver, one of their boat lines.  The boat line could be named Quicksilver, but Quiksilver produces "surfer" clothes and were concerned about trademark confusion.  We conducted a survey to determine level of confusion and the likely damages caused.  Brunswick dropped the t-shirt line and settled.

St. Johns Knits versus St. Johns, circa 1997.  Deposed, case settled.  Small firm in California named itself St. Johns and began to produce ladies casual apparel with name of St. Johns.  Worked for plaintiff, conducting survey on trademark confusion and calculating damages.

Nitro Leisure Products v. Acushnet.  **Antitrust,** Trademark, and Deceptive Sales Practices filed in Florida.  Deposition in 2003, settled in 2004.  Worked for defendant.  Issue was whether claims regarding the performance of "used and repackaged" golf balls were valid.  Survey conducted, used to support damage claims.  Second simultaneous suit was Acushnet v. Nitro – work used in settlement of the two simultaneously.

Community First Bank v. Community Banks.  Trademark infringement.  Deposition, October, 2004.  Worked for Defendant.  Issue was that Pennsylvania based Community Banks, a multi-state bank, opened branches in Northern Maryland.  Community First Bank claimed it already had a charter in Maryland and the intrusion of Community Banks diminished the value of their name.  Case resolved in favor of Defendant – dismissal on Summary Judgment.

*Trade Dress*
Sound Board Manufacturer v. European Manufacturer.  Trade dress infringement.  Worked for plaintiff.  Circa 1997.  Issue was that European manufacturer bought a sound board from U. S. manufacturer, reverse engineered it, and sold their copy with exactly same layout and design in competition with U.S. manufacturer.  Conducted survey of bands, churches, small recording studios, and other potential purchasers of mid-price sound boards.  Case settled.

Clothing Manufacturer v. Clothing Manufacturer.  Trade dress infringement.  Worked for plaintiff.  2004. A manufacturer of camouflage hunting clothes developed a unique camouflage design and used it for their primary line of clothes.  A second manufacturer bought materials from same fabric company and produced exactly the same design for hunting clothes sold in similar outlets to the same population of hunters.  Survey designed and implemented.  Case settled.

Manufacturer of liquid energy drinks v. manufacturer of liquid energy drinks.  Trade dress infringement.  Worked for defendant.  2006-7. A manufacturer of liquid energy drinks sold in gyms, health clubs, and big box retailers filed suit against another manufacturer of liquid energy drinks, claiming that the shape and type on the bottles of the defendant were the same as that of the plaintiffs and caused confusion among potential purchasers.  Conducted surveys of potential purchasers of liquid energy drinks to determine whether confusion exists.  Deposition in January, 2007, testimony in bench trial in January, 2007.  Defendant won.

*Patent Infringement:*
Smith & Nephew v. Zimmer, circa 1999.  Deposed, then case settled.   Worked for defendant who admitted infringing on patent but claimed that the particular feature upon which they infringed was not important to the choice of the product by physicians.  Product was hip replacement "cup" and "stem", and feature was machining of cup to minimize friction.  We conducted a survey of physicians to determine what features were important to the selection of a hip replacement part.  We used the survey to calculate damages; results were used in the settlement deliberations.

*Disparate Impact \ Discrimination*
Loss of jobs, loss of work hours, lack of promotions for population of blacks working for a manufacturer who laid off blacks first, re-hired (called back) blacks last, refused to promote, and kept overtime for only certain workers.  Worked for plaintiffs.  Analysis of hiring practices, lay off records, filings with Federal government, and other records to develop pattern of practice analysis.  Case settled, no testimony.

Disparate impact in promotions for minority workers for a large public utility.  Worked for plaintiffs. Analysis of testing and promotion procedures, development of methods to ascertain if skill tests used led to disparate treatment of minorities.  Report submitted, case ongoing.

Disparate impact for senior citizens for a public housing authority.  Worked for city housing authority – plaintiff.  Survey of senior citizens in a city to determine their attitudes and beliefs regarding different Federally sponsored senior citizen independent living facilities.  Analysis of demography of general population in the city and comparison to distributions of residents in all independent living facilities in the city.  Report and affidavit submitted, case ongoing.

Disparate impact for minorities in availability of cemetery plots in multiple cemeteries owned by single holding company.   Analysis of sales of plots to individuals to ascertain whether a pattern of practice existed.  Worked for defendant.  Case ongoing.

*Deceptive Sales Practices:*
Executech v. Appleton Papers, circa 1998.  Deposed, testified at class certification hearing.  Class denied.  Issue was whether Appleton Papers colluded with other manufacturers in the pricing of thermal fax paper products.  Appleton had already won an antitrust case in Federal court on same issue.  Conducted survey of pricing of product throughout Florida and proved that pricing of product was so discretionary at retail level that it was impossible to consider whether producer pricing had claimed impact at retail level.  Case cited by Third District Court in Florida when tobacco class ruling in Florida was overturned on appeal.

Watkins et al. v. Dry Cleaners International, 2003.  Not deposed, case settled before class hearing.  Worked for defendant.  Issue was whether DCI had properly informed customers of surcharge imposed to cover environmental costs.  Plaintiffs claimed customers were confused and thought charge was improperly imposed tax.  Survey conducted, damages calculated.

Fidelity Mortgage v. Seattle Times.   Deceptive Trade Practices in Seattle Washington.  Deposition in 2004.  Worked for plaintiff.  Damages calculated on lost sales because of publication of false interest rates.  Case in appeals court.

Deceptive Sales practices case in California involving Botox, representing the cosmetics manufacturer.  Worked for defendant.  Deposed in 2004, case dismissed.

*Toxic Tort:*
Three separate **Toxic Tort** property value diminution cases filed in Florida between 1998 and the present.  Deposition for the largest and latest case in 2001.  All three cases were environmental contamination cases, with class actions brought against manufacturer.  Worked for defense in all three cases on class certification issues and damages calculations.  Deposed in last case, First Case class was not certified, Second case settled.  Third:  Bernice Samples, et al, v. Conoco, Inc.; Agrico Chemical Company; and Escambia Treating in the Circuit Court of the First Judicial Circuit in and for Escambia County, FL, Division:  "J", June 2002, Deposition; Case settled.

*Other Antitrust:*
North Jackson Pharmacy, Inc. et al v. Express Scripts, Inc. et al.  Independent Pharmacies filed an antitrust case against Pharmacy Benefit Managers (PBMs).  Worked for plaintiffs.  Deposed in July, 2005; class certified.

North Jackson Pharmacy, Inc. et al v. Caremark  Pharmacies filed an antitrust case against Pharmacy Benefit Managers (PBMs).  Worked for plaintiffs.  Deposed in May, 2006; class certification pending.

*Other cases:*
Castro v. Ford Motor, Inc.  **Wrongful Death** Suit filed in California.  Deposition and Testimony in 2001.  Worked for defendant.  Survey used in case regarding use of Ford Explorers by the general public.  Critiqued survey and damages calculations as rebuttal expert.  Jury found in favor of Ford.

Mullinax v. Buffalo Rock.  **Wrongful Death** Suit in Alabama.  Deposition and Testimony in 2004.  Worked for plaintiff.  Sampling of trucks from Pepsi bottling plant taken and analyzed to demonstrate that Pepsi \ Buffalo Rock drivers frequently speed, even after plaintiffs mother was killed by speeding fully loaded truck.  Results were that 70 to 80 percent of trucks were observed speeding during a three month period, and 90 percent of "roll-up" trucks were speeding during this period.  Jury found in favor of plaintiff with sizable award.

Loss of value case regarding employee stock options when business owner was indicted on fraud and malfeasance charges.  Worked for plaintiff.  Case settled, no testimony.

Loss of value case regarding value of a business when a contract was wrongfully terminated.  Worked for plaintiff.  Case ongoing, no testimony yet.

Lost value and population estimates for population affected in a marketing case where a franchisor allowed a new franchise to be built in the "blocked area" around an already existing franchise.  Worked for plaintiff.  Case settled – deposition, January 2006.

Construction Defects Damages case regarding the calculation of damages based on a sample of housing units inspected and resulting damages extrapolated to the full population of units built in a new subdivision.  Worked for defense.  Case ongoing – deposition, May 2007.

Class Action, Fair Labor Standards Act (FLSA), case involving claims for overtime not paid for truck drivers.  Analysis based on travel patterns and frequency of involvement in interstate commerce and damages calculation.  Worked for plaintiffs.  Case ongoing – deposition, June, 2008.