UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-81091-Civ-Ryskamp/Vitunac

ARMOR SCREEN CORPORATION,
a Florida corporation,

      Plaintiff,

vs.

STORM CATCHER, INC.,
a Florida corporation, *et al.*,

      Defendants.
_____/

FILED by ___ D.C.

MAR 04 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Order of Reference (DE 64) from United States District Judge Kenneth L. Ryskamp "for all pretrial matters and to take all necessary and proper action as required by law, and/or to submit a Report and Recommendation to this Court." Before the Court is Defendants' Motion to Disqualify Plaintiff's Counsel (DE 394). Plaintiff responded (DE 400), and Defendants replied (DE 401). The Court ordered supplemental briefing, and the parties complied (DE 403 & 404). The Court held an evidentiary hearing on February 4, 2010 (DE 413). This matter is ripe for review.

## BACKGROUND

This case, initiated on November 16, 2007, involves parties that manufacture and sell hurricane protection screens in Florida. The Amended Complaint (DE 110) asserts causes of action for patent infringement, Lanham Act violations, deceptive and unfair trade practices, and tortious

1

interference with business relationships. The case is currently stayed pending PTO reexamination proceedings involving the patents-in-suit (DE 385). On October 14, 2009, Novak Druce + Quigg LLP attorneys Joseph Steele, Jr. and Jerold Schneider appeared as Plaintiff's counsel (DE 390 & 391), after Plaintiff's former counsel withdrew.

## PARTY CONTENTIONS

### Defendants' Motion to Disqualify Plaintiff's Counsel

Defendants move to disqualify Plaintiff's new counsel due to an alleged appearance of impropriety resulting from attorney Schneider's role as a proposed expert for Defendants earlier in this case. Defendants' former attorney, Christina DeAngelis, attests that she contacted Schneider on May 30, 2008 "in the hopes of retaining him as a patent expert" in this case. On June 18, 2008, DeAngelis "gathered documents, such as copies of the patents-in-suit, the file histories of the patents-in-suit and several key pieces of prior art on which Defendants planned to rely for their invalidity defense for a meeting" with Schneider. The two met "for an hour regarding his role in [this] litigation...[and] discussed the facts of the case, defenses, litigation strategy and finally the role that Schneider's testimony would play in the same." By letter dated June 20, 2008, Schneider offered to be Defendants' patent expert and set forth potential topics of expert testimony, including claim construction, inventorship, and Patent '085's validity based on the inherent characteristics of prior art. The letter included a fee estimate and the material to be evaluated, including the patent file histories, the parties' claim construction submissions, and any expert reports.

Defendants later changed counsel and Schneider was never retained. Even so, Defendants argue, Plaintiff's counsel should be disqualified because (1) there is a reasonable possibility that Schneider received confidences and trial strategy pertaining to Defendants, which constitutes a

2

specifically identifiable impropriety, and (2) allowing Defendants' potential expert to become Plaintiff's counsel causes public suspicion that outweighs the social interest served by Novak Druce + Quigg LLP's representation. Defendants claim that Plaintiff would suffer minimal prejudice if its counsel were disqualified given the current litigation stay. On the other hand, allowing Schneider to represent Plaintiff would have a chilling effect on patent cases by forcing counsel to rule out qualified attorney-experts for fear that such experts may later become opposing counsel.

### Plaintiff's Response

Plaintiff counters that Defendants offer insufficient justification for depriving it of its choice of counsel. By affidavit, Schneider admits to meeting with DeAngelis as a potential patent expert, but he denies ever discussing confidential information or trial strategy. Schneider notes that such discussion would have interfered with his independent opinion and would have been discoverable if he were retained as a testifying expert. Further, as a patent expert, unlike a technical or damages expert, his opinions would be based solely on public documents. Plaintiff finds it significant that no layperson was involved, only sophisticated attorneys who knew that if Schneider was retained as an expert, his conversations with defense counsel about potential expert testimony would not be privileged. Also significant to Plaintiff is that Schneider was never retained and never gave an expert report or testimony on Defendants' behalf. Plaintiff argues that, contrary to DeAngelis' conclusory statements, the only contemporaneous documents – Schneider's June 20, 2008 letter and DeAngelis' time records – support Schneider's declaration that no confidences were disclosed. Lastly, Plaintiff argues that disqualifying its counsel would create an incentive for law firms to meet with several patent experts, engage none of them, and effectively block those experts from becoming opposing counsel.

## Defendants' Reply

Defendants argue that the fact that DeAngelis and Schneider's statements conflict as to what transpired at the June 18, 2008 meeting is, itself, sufficient grounds for disqualification. Defendants assert that the issue is not limited to who was present when the impropriety occurred; the issue is the public suspicion arising from the improper conduct. Defendants maintain that if a potential testifying attorney-expert receives confidential information, an attorney-client relationship arises and the attorney-expert is bound by attorney rules of professional conduct. Here, the reasonable possibility that an attorney-client relationship arose between Defendants and Schneider based on an exchange of confidences is enough to trigger disqualification even though Schneider was never retained. Finally, any argument that disqualifying Plaintiff's counsel would result in attorneys interviewing potential experts to ensure that those experts would not later become opposing counsel is tenuous because it presumes that counsel would expend the time, effort, and resources to do so.

## COURT-ORDERED SUPPLEMENTAL BRIEFING

After conducting independent research, the Court had questions not addressed in the party filings. Three decisions raise questions about the continued validity of the appearance of impropriety standard; Herrmann v. GutterGuard, Inc., 199 Fed. Appx. 745, 752 (11th Cir. 2006); Waters v. Kemp, 845 F.2d 260, 266 nn.12-13 (11th Cir. 1988); First Impressions Design & Mgmt., Inc. v. All That Style Interiors, Inc., 122 F. Supp. 2d 1352, 1354 n.1 (S.D. Fla. 2000). Accordingly, the Court ordered Defendants to file a supplemental brief addressing (1) whether they rely on an ethical violation as grounds for disqualification, and, if so, to identify which specific Rules Regulating The Florida Bar apply, and (2) the effect of the above-cited decisions on the continued validity of the appearance of impropriety standard.

### Defendants' Supplemental Brief

Defendants acknowledged that Eleventh Circuit authority seemingly conflicts with Florida Supreme Court authority regarding the continued vitality of the appearance of impropriety standard. Defendants contend that the Eleventh Circuit authority declining to apply the appearance of impropriety standard is based on Georgia law and does not affect the viability of that standard in Florida. Defendants' maintain that Florida law retains the appearance of impropriety standard for attorney disqualification and, thus, applies in this case involving a Florida attorney. Defendants also cite Rules 4-1.9 (Conflict Of Interest; Former Client), 4-1.10 (Imputation Of Conflicts Of Interest; General Rule), and 4-1.18 (Duties To Prospective Client) of the Rules Regulating the Florida Bar as grounds for disqualification. Defendants assert that Schneider's status as an attorney, as opposed to a typical non-attorney expert, places him in a higher position of trust with respect to fiduciary duties and, thus, his receipt of confidential information from Defendants prevents him from now taking on an adverse role.

### Plaintiff's Supplemental Brief

Plaintiff conceded that the appearance of impropriety standard is a viable basis for disqualifying a Florida attorney. Plaintiff argues that the Court should not entertain Defendants' bare assertions that confidences and strategy were shared, which are unsupported by contemporaneous documents of record. Schneider's sworn belief that he never received any confidential information from Defendants is supported by the letter he sent two days after his meeting with DeAngelis. Plaintiff argues that the Rules Regulating the Florida Bar cited by Defendants do not apply to attorney experts and are, thus, inapplicable to Schneider's potential engagement with Defendants since he never represented any Defendant, either as an expert or an attorney.

## FEBRUARY 4, 2010 HEARING

Counsel for all parties appeared at the evidentiary hearing. Two witnesses – DeAngelis and Schneider – testified. In their opening remarks, Defendants asserted that DeAngelis' testimony would clearly show that she discussed with Schneider her theories of the case, what she viewed as strengths, and those issues she viewed as problems requiring expert testimony. Defendants argue that such a circumstance strikes at the heart of the attorney-client relationship and warrants disqualification.

Plaintiff opened by arguing against disqualification based on the absence of any attorney-client relationship or actual conflict of interest as Schneider was only a proposed testifying expert who was never hired by Defendants. Plaintiff changed positions from that asserted in its supplemental brief and argued that the appearance of impropriety standard is not a viable ground for disqualification in this case.

Christina DeAngelis

DeAngelis, an associate at the Feldman Gale law firm for the past four years, testified first. DeAngelis spent 90% of her time for several months working as Defendants' former counsel in this case. On May 30, 2008, she called Schneider, a well-respected patent attorney who previously worked as a PTO examiner, at the request of another attorney in her firm, Jeffrey Feldman. At the time, her firm wanted to hire an expert with knowledge of PTO patent claims procedure. When she met with Schneider, she did not view him either as a testifying or a consulting expert because that was not a decision for her to make. Her expectation was to "discuss the case" and "get...a feel for [Schneider's] opinion." (Hr'g Tr. 25:21-22, Feb. 4, 2010). According to DeAngelis, the two discussed the file histories of the patents-in-suit, prior art, her tabbed notes, and parts of her analysis,

6

including what she viewed as strengths in Defendants' case. For example, she disclosed a person who claimed prior inventorship. She expressed her concerns over conflicting opinions of different PTO examiners involving the patents. She also asked for Schneider's opinion on inherency in the patent. Further, she recalled discussing her knowledge of the "Parsons reference" – an FAA installation in the Caribbean, which her firm believed to be an installation of the claimed invention years before the patent was filed. (Hr'g Tr. 42:1-20). When she met Schneider, DeAngelis was confident in her clients' case and recalled "talking pretty freely with him because he was the only person we were thinking about retaining, and he's an attorney, I'm an attorney, I don't know. We just were talking freely about [the case]." (Hr'g Tr. 28:13-16). According to DeAngelis, the reason Schneider was not hired was because Defendants' insurance company found his rates were too high.

On cross-examination, DeAngelis stated that a patent expert's role is to review public records, like patent file histories and prior art, to determine whether the PTO should have granted a patent. Patent experts also opine on claim construction issues. DeAngelis agreed that a patent expert is an objective renderer of opinion. When she met with Schneider, her firm hadn't "really decide[d] whether or not we were going to use him as a testifying or a consulting expert at that point." (Hr'g Tr. 33:17-18). While it was possible that he would become a testifying expert whose report could be discoverable by the opposing party, it was equally possible that he could become a consulting expert. DeAngelis agreed that the June 20, 2008 letter from Schneider offering his expert services accurately depicts what he was being asked to do if hired as an expert, but on redirect, she described the letter as "vague" with "broad categories that we spoke about." (Hr'g Tr. 40:7). Regarding Schneider's offer in his letter to provide an "oral opinion" to Defendants, DeAngelis stated that she has received oral opinions before written opinions from past experts. In such cases,

7

determining the necessity for a written opinion would be based on the expert's oral opinion.

In response to the Court's inquiries, DeAngelis said the purpose of the meeting was to talk about the case, go over documents, and see if Schneider could give an expert opinion. She recalled thinking that Defendants' case hinged on the issue of inherency and she remembers discussing this issue with Schneider. She was tasked by her firm "to explain our position in the case, to go through what we knew about the case, to go through the things that we had found in our research," (Hr'g Tr. 47:20-22), like prior art, the Parsons information, and the prior inventorship issue. With no protective order in place, DeAngelis stated that she gave Schneider only public documents, but she claims to have verbally told him her impressions of the strengths and weaknesses in Defendants' case. DeAngelis had no notes or emails from during or after the meeting.

Jerold Schneider

Schneider testified next. Schneider is a partner in Novak Druce + Quigg's West Palm Beach office. He has practiced intellectual property law since 1972. Schneider testified that, when he met with DeAngelis, he was absolutely not informed or given any information that he was told was confidential. Schneider agreed that his letter of June 20, 2008 confirmed the points of the meeting. He explained that, if he were to have been hired as a patent expert, his opinions on claim construction, patent validity based on inherent characteristics, and inventorship would have all been derived from public records. Schneider confirmed that he was never hired by Defendants.

On cross-examination, Schneider stated that he was never previously hired by Feldman Gale as a patent law or advisory expert. He agreed that he primarily referred to his June 20, 2008 letter for purposes of recalling what happened at the meeting and creating his affidavit. His understanding by the end of the meeting was that Feldman Gale was going to recommend his selection as an expert

subject to payment approval by Defendants' insurance company. He did not recall whether the documents given to him by DeAngelis had tabs to draw his attention to certain sections. He did not recall if the documents he received had DeAngelis' handwritten notes. He recalled her pointing to specific items of prior art, but "before hearing her testimony today, I had no recollection of which specific items they were." (Hr'g Tr. 67:21-22). Further, he "think[s] she pointed to words in certain documents[,]" (Hr'g Tr. 68:1), but could not recall how she thought those words affected the merits of the case. He took notes during the meeting, but he threw those notes out after writing the June 20, 2008 letter.

Schneider indicated that litigators do not generally designate someone as a testifying expert before hearing the expert's opinion on issues in the case. He agreed that before an expert is designated as a testifying expert, any opinion disclosed by that expert to the hiring attorney remains confidential. Schneider maintained that he did not offer any opinions to DeAngelis. He agreed that giving an oral opinion is the customary first stage of being an expert in order to limit the written record that could be revealed through later discovery. He admitted that the topic of inherency came up in the meeting, but he couldn't recall any specifics beyond what was in his letter. He remembered talking about prior art in general, but did not recall ever speaking about specific prior art in the context of construing certain patent claims. He did not recall the Parsons reference when he signed his affidavit, however, after hearing DeAngelis' testimony, he recalled "that there was something somewhere in the Caribbean with an FAA tower, and I said that doesn't qualify as public use if it wasn't in the United States." (Hr'g Tr. 76:13-15). Prior to offering his services, Schneider told DeAngelis the potential topics for his expert testimony, but offered no conclusions.

In response to the Court's inquiries, Schneider said his billing rate as an attorney and as a

patent expert are the same – $550 per hour – because doing one takes time away from the other. He never billed or received payment for his meeting with DeAngelis. Schneider could not find his notes or any emails from the meeting.

## DISCUSSION

The Court must decide if an attorney who discusses a case as a potential expert for a party, but who is never retained, should be disqualified from later becoming counsel for the opposing party in the same case. This issue is novel. There is limited authority on ethical conflicts stemming from the potential or actual engagement of an attorney as an expert. This authority offers only general guidance as the Court's analysis is necessarily very fact dependent.

I. Standard of Review

The party moving to disqualify bears the burden of proving the grounds for disqualification. In re: BellSouth Corp., 334 F.3d 941, 961 (11th Cir. 2003). When ruling on a motion to disqualify, a court must "be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." Woods v. Covington County Bank, 537 F.2d 804, 810 (5th Cir.1976). Disqualification of one's chosen counsel is a drastic remedy that should be resorted to sparingly. Norton v. Tallahassee Mem'l Hosp., 689 F.2d 938, 941 n. 4 (11th Cir.1982). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if compelling reasons exist." In re: BellSouth Corp., 334 F.3d at 961.

II. The Appearance of Impropriety Standard

Defendants argue that the Court should disqualify Plaintiff's counsel under the appearance of impropriety standard. While Plaintiff stated in its supplemental brief that this standard is a viable

10

basis for disqualification, Plaintiff changed its position at the hearing to argue that the appearance of impropriety standard does not apply in this case. This dispute centers on whether the appearance of impropriety standard survived Florida's adoption of the Model Rules and qualifies as an independent ground for disqualification. One case notes that, following Florida's adoption of the Model Rules, the appearance of impropriety is not a proper standard for attorney disqualification. Ganobsek v. Performing Arts Ctr. Auth., 2000 WL 390106, *1 n.5 (S.D. Fla. 2000). Two other cases raise, but do not clearly resolve, the issue: (1) First Impressions Design & Mgmt., Inc. v. All That Style Interiors, Inc., 122 F. Supp. 2d 1352, 1354 n.1 (S.D. Fla. 2000); (2) Patrick Power Corp. v. Chub Cay Club Assoc., Ltd., 2007 WL 2883179, at *3-4 (Bankr. S.D. Fla. 2007). To resolve the issue, the Court reviews the chronology of pertinent Eleventh Circuit authority on attorney disqualification, starting with former Canon 9 and the Norton test.

Canon 9 of the former Model Code stated, "[a] lawyer should avoid even the appearance of professional impropriety."[1] Based on this canon, the Eleventh Circuit adopted a two-prong test to determine if the appearance of impropriety warranted attorney disqualification: (1) "there must exist a reasonable possibility that some specifically identifiable impropriety did in fact occur;" and (2) "the likelihood of public suspicion or obloquy must outweigh the social interests that will be served by the attorney's continued participation in the case." Norton, 689 F.2d at 941 (citing United States v. Hobson, 672 F.2d 825 (11th Cir. 1982)). This became known as the Norton test.

In a later case applying Georgia law, the Eleventh Circuit observed that "the Model Code has been replaced by the Model Rules, and thus does not govern the professional conduct of attorneys

---

[1] Florida replaced the Model Code with the Model Rules in January, 1987. The Model Rules do not contain this provision.

in the Southern District of Georgia. Under the Model Rules, the appearance of impropriety is not a ground for disqualifying a lawyer from representing a party to a lawsuit." Waters v. Kemp, 845 F.2d 260, 265 (11th Cir. 1988). The "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases. This is particularly true where ... the appearance of impropriety is not very clear." Id. at 265 n.12 (quoting Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1247 (2d Cir.1979)).

In 1997, the Eleventh Circuit reconciled two lines of intra-circuit cases involving attorney disqualification. One line of cases involved conduct disruptive of the proceedings or constituting a threat to the orderly administration of justice. Schlumberger Tech., Inc. v. Wiley, 113 F.3d 1553, 1560 (11th Cir. 1997) (giving as examples in-court attorney misconduct and an attorney deliberately advising client to disobey a district court's protective order). Recognizing the need for sure and swift responses to such conduct, the Eleventh Circuit gives great deference to disqualification decisions falling within this first line of cases. Id. at 1558, 1561. In the second line of cases "where the district court's disqualification order is based on an allegation of ethical violation, the court may not simply rely on a general inherent power to admit and suspend attorneys, without any limit on such power. The court must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule ... for its order to be upheld." Id. at 1561. In these circumstances, the Eleventh Circuit "insist[s] that district courts rest their disqualification decisions on the violation of specific Rules of Professional Conduct, not on some 'transcendental code of conduct ... that ... exist[s] only in the subjective opinion of the court.'" Id. (citation omitted).

Four years ago, the Eleventh Circuit again revisited the Norton test. Applying Georgia law,

the Eleventh Circuit held that because Georgia's State Bar no longer expressly prohibited the appearance of impropriety, the "court was under no obligation to perform the Norton balancing test." Herrmann v. Gutterguard, Inc., 199 Fed. Appx. 745, 754 (11th Cir. 2006). Thus, the district court "properly applied the conflict of interest standard and did not apply the outdated appearance of impropriety standard." Id. at 755.

Despite the foregoing authority and Florida's adoption of the Model Rules, numerous federal district courts in Florida continue to apply the Norton test.[2] These decisions rely on State Farm Mut. Auto. Ins. Co. v. K.A.W., 575 So.2d 630 (Fla. 1991), and its progeny, for the proposition that while Florida's professional rules no longer prohibit the appearance of impropriety, Florida law retains the requirement.

In State Farm, the Florida Supreme Court reversed the lower courts' decisions and ordered the disqualification of a law firm representing passengers in a case arising out of a car crash, because the law firm had previously represented the car's driver and passengers in a suit against third-party insurers and tortfeasors arising from the same car crash. The State Farm court concluded that actual proof of prejudice is not a prerequisite to disqualification, and that the attorney-client relationship between the driver and the law firm raised an irrefutable presumption that confidences were disclosed. Id. at 634. In reaching its decision, the Florida Supreme Court affirmed the continued applicability of a two-prong disqualification test in conflict-of-interest cases: (1) the existence of an

---

[2] See, e.g., Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla., 2008 WL 2959853 (S.D. Fla. 2008), at *1; Herrera-Shorthouse v. La Cubana Bail Bonds, Inc., 1999 WL 33266031, at *5 (S.D. Fla. 1999); Concerned Parents of Jordan Park v. Housing Auth. of the City of St. Petersburg, 934 F.Supp. 406, 410 (M.D. Fla. 1996); McPartland v. ISI Inv. Servs., Inc., 890 F.Supp. 1029, 1030 (M.D. Fla. 1995); Rentclub, Inc. v. Transamerica Rental Finance Corp., 811 F.Supp. 651, 654 (M.D. Fla. 1992), aff'd, 43 F.3d 1439 (11th Cir.1995).

attorney-client relationship, giving rise to an irrefutable presumption that confidences were disclosed during the relationship, and (2) that the matters in the pending suit are substantially related. Id. at 633. The irrefutable presumption in the first prong was upheld, notwithstanding Florida's adoption of new professional rules, because the "Rules of Professional Conduct requiring confidentiality serve the same purposes as the confidentiality requirements" of the former Code. Id. The Florida Supreme Court did "not believe that a different standard now applies because the specific admonition to avoid the appearance of impropriety does not appear in the Rules of Professional Conduct. Id. at 633. The court further emphasized that "the need for the irrefutable presumption continues to exist, just as under the former code" and the presumption "acknowledges the difficulty of proving" disclosure of confidential information. Id. at 634.

Subsequent courts interpret the State Farm decision as establishing Florida's retention of the appearance of impropriety standard despite the change in rules. This interpretation, however, does not follow. The State Farm reference to appearance of impropriety was made only in the context of affirming the same two-prong test, and particularly the irrefutable presumption, that was applied prior to Florida's adoption of the new rules. This Court does not read the decision as retaining the appearance of impropriety standard and respectfully disagrees with those courts that do.

Like the Georgia bar rules at issue in Waters and Hermann, the current Rules Regulating the Florida Bar no longer prohibit the appearance of impropriety. With former Canon 9's language focusing on "even the appearance of impropriety" gone from the rules governing attorneys practicing in the Southern District of Florida, and no language that is similar, the test based on Canon 9 is improper. Consequently, the Court finds that the appearance of impropriety does not qualify as an independent ground for disqualification in this case. As in Hermann, this Court is not obligated to

14

apply the Norton test. Instead, because this case involves alleged ethical misconduct, this Court "must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction" – here, the Rules Regulating the Florida Bar – and determine if Plaintiff's counsel violated that rule. Schlumberger, 113 F.3d at 1561.

III.     Rules Regulating the Florida Bar

Attorneys in the Southern District of Florida are governed in their professional conduct by the Rules Regulating the Florida Bar. S.D. Fla. Local Rule 11.1(C). As an initial matter, the Court disagrees with Plaintiff's argument that these rules do not apply to Schneider's potential engagement as an expert. Plaintiff cites non-binding authorities holding that attorney disciplinary rules do not apply to ordinary non-attorney experts, see, Great Lakes Dredge & Dock Co. v. Harnischfeger Corp., 734 F.Supp. 334, 338-39 (N.D. Ill. 1990); EEOC v. Locals 14 & 15 Int'l Union of Operating Eng'rs, 1981 WL 163, *3-4 (S.D.N.Y. 1981), and argues that the same is true for attorney-experts like Schneider. Such argument asks the Court to ignore Schneider's status as an attorney then and now. This, the Court refuses to do. Where, as here, an attorney currently represents a client when that same attorney has previously received information from the opposing party in the same case, it is axiomatic that the rules governing attorney conduct apply. This is true regardless of the capacity in which the attorney previously received the information.

Rule 4-1.9 (Conflict of Interest; Former Client) prohibits attorneys from representing another person in the same or a substantially related matter in which that person's interests are materially adverse to a former client's interests, using information relating to the representation to the former client's disadvantage, or revealing information relating to the representation. Rule Reg. Fla. Bar. 4-1.9(a)-(c). The rule's comment states that, in applying the rule, it is necessary to determine if the

15

attorney "was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." Rule Reg. Fla. Bar. 4-1.9 (cmt). The comment distinguishes an attorney who is "directly involved in a specific transaction" and an attorney who "recurrently handled a type of problem for a former client." Id. In the first circumstance, "subsequent representation of other clients with materially adverse interests clearly is prohibited." Id.

At first blush, it would appear that Rule 4-1.9, by its own terms, does not apply because Schneider never represented any Defendant. However, at least one Florida court has found an attorney-client relationship and disqualified an attorney under Rule 4-1.9, where the attorney gained confidential information in a role other than as an attorney. Tuazon v. Royal Caribbean Cruises, Ltd., 641 So. 2d 417 (Fla. 3d DCA 1994). In Tuazon, a plaintiff's attorney was disqualified based on the attorney's past employment as a claims adjuster for the defendant. Tuazon, 641 So. 2d at 417-18. The attorney had "adjusted, evaluated, investigated and handled claims on behalf of the [d]efendant, some of which claims were of the type involved in this case." Id. The attorney had been "privy to the confidential procedures and policies of the [d]efendant." Id. The court described this information as "not generally known" and found the attorney subject to Rule 4-1.9. Id. The attorney's receipt of confidential information "falls squarely within the proscription of" Rule 4-1.9" although he learned the information while working as a claims adjustor. Id. As the court held;

> To suggest that because Plaintiff's attorney was not functioning as a lawyer when the confidential information was learned, or that the confidential information does not relate directly to this case, begs the issue. The issue is, to paraphrase [Rule 4-1.9], does the information (not generally known) put the Defendant at an unfair disadvantage?

Id.

16

Here, the Court is confronted with a similar issue to that presented in Tuazon – whether Schneider learn confidential information during his meeting with DeAngelis that puts Defendants at an unfair disadvantage. The Court concludes that he did. The evidence shows that DeAngelis and Schneider discussed confidential information, and that DeAngelis expected her communications with Schneider to be confidential. She testified to having "talk[ed] pretty freely with [Schneider] because he was the only person we were thinking about retaining, and he's an attorney, I'm an attorney, I don't know. We just were talking freely about [the case]." (Hr'g Tr. 28:13-16.) DeAngelis was speaking to another attorney and it was reasonable for her to believe that her contact with Schneider took on a confidential character based on Schneider's profession and proposed expert role.

During the meeting, DeAngelis advised Schneider about the Parsons reference and her firm's belief that this was an installation of the claimed invention before the patent was filed. She discussed her concerns about the conflicting opinions of different PTO examiners involving the patents-in-suit. DeAngelis raised the issue of inherency from Defendants' perspective and asked Schneider for his opinion on this issue. She disclosed the identity of possible co-inventor, Munn Reynolds Dodd. This information, discussed from Defendants' perspective, was not "generally known" and, instead, constitutes confidential information. Schneider admitted that while he did not recall the Parsons reference when signing his affidavit, his memory was refreshed by DeAngelis' testimony at the hearing regarding the same. (Hr'g Tr. 76:13-15). The Court is troubled by Schneider's inability to recollect the Parsons reference discussion until after DeAngelis testified at the hearing. Further, when asked at the hearing about other specific information the two discussed at the meeting, Schneider responded several times that he could not recall beyond what was in his written letter.

17

Plaintiff argues strenuously that Schneider's role as a testifying, as opposed to a consulting, expert was clear from the outset. The Court disagrees. Nowhere in his letter to DeAngelis did Schneider indicate that his proposed role would only be that of a testifying expert. As Schneider was never retained, it is unclear whether his role would have been that of a testifying or consulting expert. Plaintiff argues it would not have made sense for DeAngelis to have discussed confidential information with Schneider because any communications between them would have been discoverable if he had been retained as a testifying expert. While it may not have been a strategically sound decision for DeAngelis to discuss confidential information with an attorney who could have become a testifying expert subject to deposition by the other side, this does not mean that it did not happen. As discussed above, the evidence shows that the two did discuss confidential information.

Unlike Tuazon, where the attorney learned the confidential information while employed for the defendant, Schneider was never hired or retained by Defendants. While the facts are different, the Tuazon principle remains the same, and the Court chooses to follow it. As in Tuazon, Schneider has been privy to confidential information pertaining to Defendants in this case. He met with DeAngelis to discuss his possible retention as an expert for Defendants. During the meeting, he learned considerable knowledge about the case from Defendants' perspective. DeAngelis testified to having spoken freely about her client's case and disclosing information, such as the Parsons reference, conflicting opinions of PTO examiners, and the issue of inherency, as this information related to the defense in this case. This information was confidential. Like the disqualified attorney in Tuazon, Schneider is subject to the restraints of Rule 4-1.9. This is true even though he learned the confidential information as a potential expert for Defendants, not as their attorney. The confidential information he learned relates directly to issues in this case. Thus, there is a real risk

that Schneider has confidential information that could be unfairly used against Defendants. As such, allowing Schneider to switch sides and represent Plaintiff would place Defendants at an unfair disadvantage and, thus, presents a conflict of interest that warrants disqualification.

Rule 4.1-10 provides that if an attorney is prohibited from representing a client based on a conflict of interest arising under Rule 4-1.9, then the rest of that attorneys' firm is likewise prohibited from representing the client. Rule Reg. Fla. Bar 4.1-10. Having concluded that Schneider is prohibited from representing Plaintiff based on a conflict of interest arising under Rule 4-1.9, the Court further concludes that Schneider's conflict of interest is imputed to the rest of his law firm, Novak, Druce + Quigg, LLP.

IV. Conclusion

Having carefully considered the parties' arguments, the evidence presented at the hearing, and all relevant case law and applicable rules, the Court concludes that disqualification is warranted in this case based on Rules 4-1.9 and 4-1.10. The Court does not make this decision lightly. In recommending disqualification, the Court recognizes its obligation to balance the need to ensure ethical conduct of attorneys with other social interests, including a party's right to freely chosen counsel. Here, the need to ensure ethical conduct by attorneys outweighs Plaintiff's interest in retaining counsel of its own choosing.

While the Court does not know every detail of what transpired at the June 18, 2008 meeting between DeAngelis and Schneider, the evidence establishes that DeAngelis disclosed confidential information to Schneider. The evidence shows that Schneider received confidential information, including defense strategy, from DeAngelis relating to this case. The Court would be entirely remiss in its obligation to assure ethical conduct by attorneys appearing before it by permitting Schneider

to now switch sides and represent Plaintiff in the same case in which he previously received confidential information during a meeting with Defendants' prior counsel. This scenario constitutes compelling circumstances that counsel in favor of requiring disqualification to safeguard ethical responsibility by attorneys and to preserve the integrity of this proceeding.

## RECOMMENDATION TO THE DISTRICT COURT

Based on the foregoing, this Court respectfully RECOMMENDS that the District Court GRANT Defendants' Motion to Disqualify Plaintiff's Counsel (DE 394), DISQUALIFY the law firm of Novak Druce + Quigg LLP from continuing to represent Plaintiff in this cause of action, and ORDER Plaintiff to immediately retain new counsel as required by law. See Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir.1985), cert. denied, 474 U.S. 1058 (1986) ("a corporation...cannot appear pro se, and must be represented by counsel").

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Kenneth L. Ryskamp, within fourteen (14) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See United States v. Warren, 687 F.2d 347, 348 (11th Cir.1982), cert. denied, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of Florida, this 4 day of March, 2010.

ANN E. VITUNAC
United States Magistrate Judge

Copies to:
The Honorable Kenneth L. Ryskamp
All counsel of record